660 P.2d 1323

CHANDLER SUPPLY COMPANY, INC.,
Plaintiff-Respondent,

and

Industrial Indemnity Company, Involun-
tary Plaintiff-Respondent,

v.

CITY OF BOISE, a municipal corpora-
tion, Defendant-Appellant.

No. 13489.

Supreme Court of Idaho.

Feb. 4, 1983.

Rehearing Denied April 13, 1983.

Peter J. Boyd, of Elam, Burke, Evans, Boyd & Koontz, Boise, for defendant-appellant.

John P. Howard, of Quane, Smith, Howard & Hull, Boise, for respondents.

BAKES, Justice.

This appeal is brought from a final judgment entered in favor of the respondents, Chandler Supply Co., Inc., and Industrial Indemnity Co. Chandler had brought suit against the appellant, City of Boise, under the Idaho Tort Claims Act, Idaho Code title 6, chapter 9, alleging negligence on the part of Boise's fire department. The facts appear to be substantially as follows.

On December 22, 1976, at about 5:34 p.m., the Boise Fire Department responded to the activation of a building fire alarm. On arrival at the reported location, the firefighters discovered a grass fire of unknown origin burning between a set of railroad tracks and a fence enclosing a warehouse. The firefighters extinguished the fire using burlap bags, shovels, and buckets of water. Before leaving the scene at approximately 5:55 p.m., members of the fire department checked the exterior of the warehouse and found no evidence that the building was involved in the fire. At approximately 6:12 p.m., in response to a telephone report of a building on fire, the fire department returned to the location of the earlier grass fire. The firefighters discovered that the previously checked warehouse was on fire. The fire was fought and extinguished, but resulted in substantial damage to property owned by Chandler. Both Chandler and his insurer filed timely claims with the city. A jury trial was held which resulted in a special verdict finding Boise 75% negligent and Chandler 25% negligent. Total damages amounted to $116,331.31. The city of Boise now appeals.

■ The primary question [1] raised by appellant is whether the trial court erred in refusing to hold the city of Boise immune from liability under I.C. § 6–904(1), the "discretionary function" exception to the Tort Claims Act. However, respondents initially argue that Boise is barred from raising that defense on appeal because Boise failed to assert immunity as an affirmative defense in its pleadings. I.R.C.P. 15(b) states that "[w]hen issues not raised by the pleading[s] are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." That rule also provides that while the pleadings may be amended to conform the pleadings to the evidence, "failure so to amend does not affect the result of the trial of these issues." An examination of the record reveals that the issue of governmental immunity pursuant to the discretionary function exception was presented to and tried by the trial court. Consequently, we hold that pursuant to I.R.C.P. 15(b) the issue of governmental immunity was properly presented to this Court on appeal.

I.C. § 6–903(a), as it read in 1976, set forth the basic rule governing the liability of governmental entities in Idaho for tort claims filed against them.

"6–903. LIABILITY OF GOVERNMENTAL ENTITIES—DEFENSE OF EMPLOYEES.—(a) Except as otherwise provided in this act, every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties, *whether arising out of a governmental or proprietary function, where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho.*" (Emphasis added.)

I.C. § 6–904 contains several exceptions to the basic rule of governmental liability established under I.C. § 6–903(a). The exception relevant to the present case is the "discretionary function" exception contained in subsection (1) of I.C. § 6–904, which, in 1976, read as follows:

"6–904. EXCEPTIONS TO GOVERNMENTAL LIABILITY.—A governmental

1. Appellants raise several issues on appeal. However, since we reverse on the basis that the Boise Fire Department was not subject to liability under the Tort Claims Act, we do not reach the other issues presented.

entity shall not be liable for any claim which:

"1. Arises out of any act or omission of an employee of the governmental entity exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."* (Emphasis added.)

The scope of governmental liability under this scheme was first addressed by this Court in *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979). In *Dunbar,* the plaintiffs claimed that the state was liable for the deaths of certain miners arising from the 1972 Sunshine Mine disaster on the grounds that the state "undertook . . . to inspect and enforce safety in the aforementioned mine and failed to enforce an elementary accident prevention program. . . ." 100 Idaho at 530, 602 P.2d at 28. The district court held that the action in *Dunbar* was precluded under the discretionary function exception to the Idaho Tort Claims Act, I.C. § 6–904(1).

On appeal, the parties in *Dunbar* focused their arguments on the interpretation of the discretionary function exception. 100 Idaho at 529, 602 P.2d at 27. Nevertheless, this Court's holding in *Dunbar* that the state was not subject to liability under the Tort Claims Act *did not* rest on an application of that exception; rather, it rested on the provisions of I.C. § 6–903(a). Following an exhaustive review of numerous cases from other jurisdictions which illustrated the great confusion prevailing on the subject of governmental immunity under similar tort claims statutes, this Court stated the following in *Dunbar:*

"Section II(7) of that act (now codified as I.C. § 6–903(a)) provides that a governmental entity shall be liable for acts 'where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho.'

"As we have indicated above, there is no uniformity of interpretation of *such language* by courts nor are there alternative interpretations from which we might select as persuasive that one interpretation most supported by logic and reason." 100 Idaho at 545, 602 P.2d at 43 (emphasis added).

Then, following further discussion concerning the "melange of decisions" from other jurisdictions, this Court concluded that with regard to the mine inspections by the state "[t]here are not parallel functions in the private sector." As a result, it was held that the state was not subject to liability under the Tort Claims Act.

It is clear that the "parallel functions" test was an application of I.C. § 6–903(a) which waives sovereign immunity "if a private person or entity would be liable for money damages under the laws of the state of Idaho." As a consequence of the conclusion in *Dunbar* that mine inspections performed by the state had no parallel in the private sector, and that sovereign immunity was therefore not waived under the language of I.C. § 6–903(a), it was unnecessary in that case for this Court to interpret or apply the discretionary function exception contained in I.C. § 6–904(1).

Two subsequent opinions by this Court, *Gavica v. Hansen,* 101 Idaho 58, 608 P.2d 861 (1980), and *McClure v. Nampa Highway Dist.,* 102 Idaho 197, 628 P.2d 228 (1981), may have engendered some confusion concerning the extent of our holding in *Dunbar.* Both *Gavica* and *McClure* concerned the question of governmental liability where there was a failure on the part of the responsible governmental agencies to post signs warning of dangerous highway conditions. In *Gavica,* this Court approached the question of governmental immunity by recognizing that the state's primary argument was that the signing of highways constituted a discretionary function under I.C. § 6–904(1). The opinion in *Gavica* began by reviewing this Court's decisions in *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970), and *Dunbar v. United Steelworkers of America, supra.* The ruling in *Smith* had

abrogated state immunity for tortious acts done in a governmental unit's *proprietary capacity,* 93 Idaho at 802, 473 P.2d at 944. *Gavica,* however, recognized that the subsequently enacted Tort Claims Act was controlling on the question of governmental immunity. Since I.C. § 6–903(a) established the basic rule governing the tort liability of governmental entities, the proper course in *Gavica* was to first determine whether failure to sign a dangerous condition on a highway fell within the scope of I.C. § 6–903(a). Consequently, *Dunbar* was reviewed because it had in fact interpreted I.C. § 6–903(a) and had established the "parallel function" test. *See* 100 Idaho at 65, 608 P.2d at 868.

In applying the "parallel function" test to the facts in *Gavica,* this Court concluded that in contrast to the result in *Dunbar,* where state mining inspections had no parallel function in the private sector, the signing of dangerous conditions on public property in fact did have a parallel in the private sector. Comparison was found in the situation of a private landowner who has a duty to warn others of known dangerous conditions on his property. After concluding that there was a parallel function under the *Dunbar* rule, this Court also held very summarily that the state's alleged negligence in *Gavica* was not immunized under the discretionary function exception of I.C. § 6–904(1). 100 Idaho at 66, 608 P.2d at 869. Despite the brevity of the conclusion in *Gavica* with regard to the discretionary function exception, that holding was separate and distinct from the parallel function analysis applicable to I.C. § 6–903(a).

Waiver of governmental immunity under the Tort Claims Act, I.C. § 6–903(a) and § 6–904, contemplates a two step process. The first step consists of determining whether the governmental or proprietary function has a parallel in the private sector and if a private person would be liable under the same circumstances. The second step consists of determining whether there are any applicable exceptions to liability. Indeed, if the discretionary function exception were to be measured in terms of "parallel functions in the private sector," it would add nothing to the legislative plan over that provided under I.C. § 6–903(a), and the discretionary function exception would be mere surplusage and of no effect. A statute, however, must be construed, if possible, so that effect is given to all its provisions. *University of Utah Hospital & Medical Center v. Bethke,* 101 Idaho 245, 611 P.2d 1030 (1980); *Norton v. Dept. of Employment,* 94 Idaho 924, 500 P.2d 825 (1972).

In *McClure v. Nampa Highway Dist., supra,* this Court was faced with another highway signing case, and simply followed the holding in *Gavica* by quoting the conclusion from the *Gavica* opinion which referred to both the parallel function and discretionary function tests. Although *McClure* might be read in such a way as to imply that the discretionary function exception is to be defined in terms of the parallel function test, such a reading would be in conflict with not only our decision in *Dunbar* but also with the clear intent of the statutory scheme, and thus surpass the intended scope of *McClure.*

While in *Gavica* and *McClure* the Court considered the discretionary function exception as it relates to the signing of highways, we have not as yet set forth any general guidelines for determining the scope of the discretionary function exception. Since there is a great need for some guidance on the subject, we will assume that the firefighting activities of Boise have a parallel function in the private sector under I.C. § 6–903(a), and proceed to a discussion of the discretionary function exception.

Although the Tort Claims Act which our legislature enacted is very similar to that passed by Congress and many other states, our review in *Dunbar* of the "melange of decisions" interpreting such acts yields the conclusion that the decisions from other jurisdictions provide little guidance for defining the scope of governmental liability under our own Tort Claims Act. As stated in *Dunbar,* "[A]lthough we may derive some scintilla of intent from legislative language, we are left with the task of determining

and enunciating policy." 100 Idaho at 546, 602 P.2d at 44. We therefore undertake an independent analysis of the discretionary function exception as contained in I.C. § 6–904(1).

Interpretation of the discretionary function exception must begin with a review of the status of sovereign immunity in Idaho immediately preceding the enactment of the Tort Claims Act. In *Smith v. State,* 93 Idaho 795, 802, 473 P.2d 937, 944 (1970), this Court held the following:

> "[W]e hereby hold that the doctrine of sovereign immunity is no longer a valid defense in actions based upon tortious acts of the state or any of its departments, political subdivisions, counties, or cities, where the governmental unit has acted in a *proprietary as distinguished from a governmental capacity.*" (Emphasis added.) [2]

The Court in *Smith* also invited the legislature to exercise its own prerogative in the area of sovereign immunity and therefore delayed the effect of the *Smith* decision until "60 days subsequent to the adjournment of the First Regular Session of the Forty-First Idaho State Legislature . . . ." 93 Idaho at 808, 473 P.2d at 950.

The significance of the *Smith* decision in the present case is the fact that while this Court abolished its prior court made rule of sovereign immunity for *proprietary* functions of a governmental unit, that abolition did *not* extend to traditional *governmental* functions. The forty-first legislature, however, subsequently waived sovereign immunity for tortious acts with respect to not only *proprietary* but also to *governmental* functions of a governmental unit which have a parallel in the private sector. 1971 Idaho Sess.Laws ch. 150, § 3; 1976 Idaho Sess.Laws ch. 309, § 4; I.C. § 6–903(a). Thus, the legislature was more expansive in allowing relief from governmental torts than was this Court in *Smith.* Of course, the legislature enacted certain exceptions to governmental liability, including the discretionary function exception. 1971 Idaho Sess. Laws ch. 150, § 4. The question is, what was the intent behind establishing those exceptions, particularly the discretionary function exception.

In abolishing its prior rule of sovereign immunity for tortious acts arising from *proprietary* functions of the state, this Court in *Smith* did not provide for any exceptions to such immunity.[3] The unstated but obvious reason underlying such unrestricted tort liability arising from a governmental unit's proprietary functions was that such liability does not impinge upon the ability of the government to supply the services for which it has traditionally been responsible. This concept appears to have been carried over in the legislature's formulation of exceptions to governmental tort liability under I.C. § 6–904.[4] Only subsec-

---

**2.** The holding in *Smith* did not in fact effect such a significant change in the law as the language might indicate with regard to political subdivisions and cities. In the prior case of *Ford v. City of Caldwell,* 79 Idaho 499, 505, 321 P.2d 589, 593, (1958), the following was stated:
> "It is well established in this jurisdiction that a municipality in the absence of a statute imposing liability is not liable for the torts of its officers and employees occurring in the exercise of a governmental function; *it is liable only when acting in a proprietary capacity.*" (Emphasis added.)

*See generally,* Note, Sovereign Immunity in Idaho, 7 Idaho L.Rev. 267 (1970).

**3.** *Smith* clearly held that the maintenance of highways is a proprietary function, as opposed to a governmental function of the state. The signing problems in *Gavica* and *McClure* likewise concerned *proprietary* functions of the state. Consequently, as discussed below, the

activities involved in *Gavica* and *McClure* were clearly beyond the scope of the discretionary function exception, and no extended discussion of that exception was necessary in those cases.

**4.** "6—904. EXCEPTIONS TO GOVERNMENTAL LIABILITY.—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

"1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the

tion (8) clearly defines an exception which is applicable to proprietary functions. Even that subsection, however, is not a true exception to liability. It merely sets forth the standard that any design or plan for the construction or improvement of public property be judged in accordance with engineering and design standards prevailing at the time of preparation of the design or plan. Exceptions under subsections (2), (3), (5) and (6) clearly apply to traditional governmental functions, and exceptions under subsections (4) and (7) focus on activities properly attributable to individuals alone rather than to the government. It seems apparent that a basic purpose behind the legislature's creation of a list of exceptions to governmental liability was to *limit* the effect of its waiver of sovereign immunity with respect to *governmental* functions. Such is particularly true with reference to the discretionary function exception under I.C. § 6–904(1). In our view, the purpose behind the discretionary function exception is to preserve governmental immunity from tort liability for the consequences which arise from *the planning and operational decision-making necessary* to allow governmental units to freely perform their *traditional governmental functions.* A review of this Court's decision in *Ford v. City of Caldwell,* 79 Idaho 499, 321 P.2d 589 (1958), helps to illustrate this principle.

In *Ford,* a young boy was injured when he was visiting the city of Caldwell's fire station. The boy was in the ready room on an upper floor of the fire station. He had with him a rocket toy which he showed to two firemen who were present. While the two firemen played with the toy, the boy fell through the hole in the floor of the ready room onto the concrete floor below and was seriously injured. Suit was brought against the city, but the trial court dismissed it. On appeal, this Court affirmed the dismissal. This Court stated that in the absence of a statute providing otherwise, a municipality was "not liable for the torts of its officers and employees occurring in the exercise of a governmental function . . . ." 79 Idaho at 505, 321 P.2d at 593. It was then held that the maintenance of a fire department by a municipal corporation is a governmental function, and that the city was therefore immune from suit for the negligence of the firemen.

*Ford* illustrates the type of result that the legislature most likely intended to change when it waived governmental tort immunity for *governmental* as well as proprietary functions. Although the firemen in *Ford* were working within the scope of a traditional governmental function, *i.e.,* a publicly maintained fire department, they were not engaged in the planning and operational decision-making necessary to the fulfillment of the primary function of the

part of a governmental entity or employee thereof, whether or not the discretion be abused.

"2. Arises out of the assessment or collection of any tax or fee, or the detention of any goods or merchandise by any law enforcement officer.

"3. Arises out of the imposition or establishment of a quarantine by a governmental entity, whether such quarantine relates to persons or property.

"4. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

"5. Arises out of the activities of the Idaho national guard when engaged in training or duty under sections 316, 502, 503, 504, 505 or 709, title 32, United States Code, and the claim arising therefrom is payable under the provisions of the National Guard Claims Act (section 715, title 32, United States Code) except that a claimant not compensated in whole or in part under the National Guard Claims Act may assert his claim under this act.

"6. Arises out of the activities of the Idaho national guard when engaged in combatant activities during a time of war.

"7. Arises out of or results from riots, unlawful assemblies, public demonstrations, mob violence or civil disturbances.

"8. Arises out of a plan or design for construction or improvement to the highways, roads, streets, bridges, or other public property where such plan or design is prepared in substantial conformance with engineering and design standards in effect at the time of preparation of the plan or design, approved in advance of the construction or approved by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval."

fire department, *i.e.,* fighting fires and providing emergency assistance. Planning and operational decision-making, as it relates to a fire department's primary function of fighting fires, is an example of the sort of decision-making we believe was intended by the legislature to remain protected under the cloak of governmental immunity through the enactment of the discretionary function exception. To hold otherwise would be to open the door to such governmental liability as that evidenced in *Downs v. United States,* 522 F.2d 990 (6th Cir. 1975).

In *Downs,* the federal government was found to be potentially liable under the federal tort claims act for murders perpetrated by a skyjacker when FBI agents shot out one of the aircraft's engines to prevent a takeoff. The court there held that the FBI agents' actions did not constitute a discretionary function because the "agents were not involved in formulating governmental policy." 522 F.2d at 997. This Court clearly disapproved of *Downs* in *Dunbar,* 100 Idaho at 535–36, 545–46, 602 P.2d at 33–34, 43–44, and certainly our legislature did not intend such a narrow interpretation to be placed upon the term "discretionary function." Public officers engaged in preserving the peace and safety of a community are called upon to exercise their judgment in a manner which often means life or death to themselves and others. Decisions in such areas as law enforcement and firefighting must often be made in an instant. Surely, by enacting the discretionary function exception, the legislature recognized that discretion in making such judgments is entitled to deference at least equal to that given to legislators and judges who have the luxury of time, debate and a comparatively safe and comfortable place to ponder and decide the ways in which governmental business should be conducted. ▉ We therefore hold that the discretionary function exception in I.C. § 6–904(1) shields governmental units from tort liability for the consequences arising from the planning and operational decision-making necessary to the performance of tradi-

tional *governmental* functions. Since the action in the present case is based upon a claim of negligence with regard to the operational decisions of city firemen in fighting a fire, a traditional governmental function, the action is barred under I.C. § 6–904(1). The judgment is reversed. Costs to appellants.

SHEPARD, J., and McFADDEN, J. (Ret.), concur.

DONALDSON, Chief Justice, dissenting.

To countenance the construction of the discretionary function exception of I.C. § 6–904(1) adopted by the majority would be to emasculate the Idaho Tort Claims Act, Title 6, Ch. 9, I.C. To construe the discretionary function exception to apply to all planning and operational decisions in traditional governmental functions does not further the general purpose of the Act as expressed in I.C. § 6–903(a). I dissent.

Prior to the adoption of the Idaho Tort Claims Act, Title 6, Ch. 9, I.C., which was the legislative response to our decision in *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970), the Court had held in *Ford v. City of Caldwell,* 79 Idaho 499, 321 P.2d 589 (1958), that an Idaho municipality would not be liable for the negligence of its officers and employees in the exercise pursuant to legislative authority of the governmental function of maintaining and operating a fire department. With the passage of the Idaho Tort Claims Act, the Court's ruling in *Ford v. City of Caldwell, supra,* has been legislatively displaced. Therefore, to resolve the present case the Court should turn to the Act, our case law construing it, and other persuasive authority. Since the passage of the Act, the Court has considered the discretionary function exception to governmental liability in three cases: *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980); *Gavica v. Hanson,* 101 Idaho 58, 608 P.2d 861 (1980); and *McClure v. Nampa Highway District,* 102 Idaho 197, 628 P.2d 228 (1981).

In *Dunbar,* the Court searched federal and sister state authority in an effort to discern a general approach or rationale by which to determine whether a function or duty was discretionary and thus would be excepted from the ambit of governmental liability. At that juncture, the Court concluded that there was "no clear theory or philosophy as to the meaning or application of the 'discretionary act' exemption to the Tort Claims Act which is common to the federal and Idaho legislation." *Dunbar, supra,* at 532, 602 P.2d at 30. The Court also concluded that with respect to the language of I.C. § 6–903(a) which provides for governmental liability "where the governmental entity if a private person or entity would be liable for money damages under the laws of the state ..." that

> "there is no uniformity of interpretation of such language by courts nor are there alternative interpretations from which we might select as persuasive that one interpretation most supported by logic and reason. Rather, we find a melange of decisions wherein reason at times seems to have flown out the window."

*Dunbar, supra,* at 545, 602 P.2d at 43. Despite such language, I believe that *Rayonier Incorporated v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), considered in *Dunbar* presents helpful guidance. *Rayonier* was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680, for losses alleged to have been caused by the negligence of federal employees in allowing a forest fire to be started on federal land and in failing to act with due care in fighting the fire. The *Rayonier* Court without explicitly considering the discretionary function exception found that negligent firefighting by governmental firefighters could result in governmental liability. I agree with the following language of *Rayonier* and believe it can be analogously applied to our own tort claims act:

> "It may be that it is 'novel and unprecedented' to hold the United States accountable for the negligence of its firefighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability.... Congress was aware that when losses caused by such negligence are charged against the public treasury they are in effect spread among all those who contribute financially to the support of the Government and the resulting burden on each taxpayer is relatively slight. But when the entire burden falls on the injured party it may leave him destitute or greviously harmed. Congress could, and apparently did, decide that this would be unfair when the public as a whole benefits from the services performed by Government employees."

*Rayonier, supra,* at 319–20, 77 S.Ct. at 377.

While traditionally municipalities have been immune from liability resulting from negligence in firefighting activities, *Ford v. City of Caldwell, supra,* I believe that the legislature has removed such immunity. In *Dunbar* we held that:

> "our legislature has intended that wherein tort liability would attach to a private person, a governmental entity engaging in the same conduct will be liable. We do not ascertain an intent to create a new cause of action against a governmental entity for its attempts to govern." *Dunbar, supra,* at 546, 602 P.2d at 44.

The activity in *Dunbar* which was held immune was governmental and had no parallel in the private sector. Here, I find no plausible reason to accord immunity to an activity which could conceivably be performed by a private entity. I see no distinction between a private individual negligently fighting a fire and the same activity performed by a municipal fire department. I feel that it would be irrational to hold such a private entity who is negligent in fighting a fire liable and a fire department who acts in the same negligent manner immune. *See Gavica v. Hanson, supra.* I cannot accept that such a result was contemplated by the legislature. In *Dunbar* the Court recognized that "although we may derive some scintilla of intent from the

legislative language, we are left with the task of determining and enunciating policy." *Dunbar, supra,* at 546, 602 P.2d at 44. I express my agreement with the following language of the United States Supreme Court:

"The broad and just purpose which the statute [Federal Tort Claims Act] was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws. Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this Court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it." *Indian Towing Company, Inc. v. United States,* 350 U.S. 61, 68–69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955).

It must be noted at this juncture, that I.C. § 6–904(1) through (8) (1974 Idaho Sess.Laws, ch. 167, p. 1423) as effective at the time of the fire involved in the instant case provided exceptions to the potential governmental liability imposed by I.C. § 6–903(a). If possible all subsections must be given effect. *University of Utah Hospital and Medical Center v. Bethke,* 101 Idaho 245, 611 P.2d 1030 (1980); *Norton v. Department of Employment,* 94 Idaho 924, 500 P.2d 825 (1972). Subsections (2), (3) and (4) would be surplusage under the construction adopted by the majority. This is apparent particularly with respect to subsections (2) and (3). Subsection (2) expressly addresses activity by a law enforcement officer which would be unnecessary under the majority's broad construction of subsection (1)'s discretionary function exception. In subsection (3), the legislature addresses another fundamental governmental function with respect to quarantines (public health) which is immune and which also would be embraced under the majority's construction of the discretionary function exception making subsection (3) surplus.

I agree with the majority that the Court's holding in *Dunbar, supra,* did not rest on I.C. § 6–904(1) but rather on I.C. § 6–903(a). Despite dictum in *Dunbar, supra,* that decisions by sister states provided no guidance with respect to construction of the discretionary function exception, I believe that the Court should reconsider and adopt the planning-operational distinction as an appropriate test of the discretionary function exception. *See, e.g., Wainscott v. State,* 642 P.2d 1355 (Alaska 1982); *Johnson v. State,* 636 P.2d 47 (Alaska 1981); *Japan Airlines Co., Ltd. v. State,* 628 P.2d 934 (Alaska 1981); *State v. Abbott,* 498 P.2d 712 (Alaska 1972); *Andolino v. State,* 624 P.2d 7 (Nev.1981); *Bigelow v. Ingersoll,* 618 P.2d 50 (Utah 1980); *Frank v. State,* 613 P.2d 517 (Utah 1980); *Morrison v. Salt Lake City Corporation,* 600 P.2d 553 (Utah 1979); *Carroll v. State Road Commission,* 27 Utah 2d 384, 496 P.2d 888 (Utah 1972).

I believe the following language of *Frank v. State,* 613 P.2d 517, 520 (Utah 1980) (state may be liable for state psychologist's negligent performance), is instructive and provides a good rationale for distinguishing what is immune under a discretionary function exception:

"The exception to the statutory waiver here under consideration, however, was intended to shield those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseeable ways from individual and class legal actions, the continual threat of which would make public administration all but impossible. The one-to-one dealings of physician and patient in no way reflect this public policy-making posture, and should not be given shelter under the Act."

The Utah Supreme Court has held that a discretionary function is

" 'confined to those decisions and acts occurring at the "basic policy making level," and not extended to those acts and decisions taking place at the operational level, or, in other words, "... those

which concern routine, everyday matters, not requiring evaluation of broad policy factors." ' " *Bigelow v. Ingersoll,* 618 P.2d 50, 53 (Utah 1980) (quoting *Frank v. State,* 613 P.2d 517, 520 (1980)).

Planning decisions as to how many fire stations to build and how many firefighters to hire would be immune under such a rationale from liability under the discretionary function exception, but immunity would not be extended to routine everyday acts and decisions made by firefighters in fighting routine everyday fires.

Additional support for a planning-operational test can be garnered from a reading of recent decisions of the Alaska Supreme Court. *See, e.g., Wainscott v. State,* 642 P.2d 1355 (Alaska 1982); *Johnson v. State,* 636 P.2d 47 (Alaska 1981); *Jennings v. State,* 566 P.2d 1304 (Alaska 1977). In *Wainscott,* a case involving a motor vehicle accident at an intersection, the Court held that a decision with respect to traffic control devices was immune under the theory of the suit under a discretionary function exception similar to that found in I.C. § 6–904(1). The *Wainscott* Court stated:

"Not all decisions involving an element of discretion, however, fall within the discretionary function exception. As numerous courts have recognized, even the most ministerial of tasks involves some degree of discretion. *See Jennings v. State,* 566 P.2d 1304, 1312 n. 30 (Alaska 1977); *Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 245, 447 P.2d 352, 357 (1968) (it is difficult to conceive of any act that does not admit of some discretion, even if it involves only the driving of a nail). Rather, the exception applies and immunity attaches when a decision entails governmental planning or policy formulation. *Japan Air Lines Co. v. State,* 628 P.2d 934, 936 (Alaska 1981); *State v. I'Anson,* 529 P.2d 188, 193–94 (Alaska 1974). A decision or action which merely implements a preexisting policy is considered operational in nature, undeserving of protection under the discretionary function exception. *State v. I'Anson,* 529 P.2d 188, 194 (Alaska 1974).

Thus, the distinction is 'between basic policy formulation, which is immune, and the execution or implementation of that basic policy, which is immune, and the execution or implementation of that basic policy, which is not immune.' *Japan Air Lines Co. v. State,* 628 P.2d 934, 936 (Alaska 1981).

"We recognize that this 'planning level—operational level' test is somewhat inexact. Nonetheless, it offers the advantage of focusing on the reasons for granting immunity to the state. *See State v. Abbott,* 498 P.2d 712, 721 (Alaska 1972). In applying the test, courts are required to isolate those decisions sufficiently sensitive so as to justify judicial abstention. In this fashion, the test serves to protect those decisions worthy of protection without extending the cloak of immunity to an unwise extent." *Wainscott v. State,* 642 P.2d 1355, 1356 (Alaska 1982) (footnotes omitted).

I dissent from the majority opinion because I perceive that its construction of the discretionary function exception emasculates the legislature's intent to permit recovery in a broader spectrum of cases and for all practical purposes nullifies the intent and purpose of the Idaho Tort Claims Act. It leaves the victims of negligent conduct by the State without recourse.

BISTLINE, J., concurring.

BISTLINE, Justice, joining the dissenting opinion of DONALDSON, C.J.

I join the opinion of the Chief Justice, which is logical, persuasive, and founded on well-established principles of law. Only because 80 percent of the members of the Idaho Bar Association have been admitted since Idaho has had a Tort Claims Act do I see a responsibility to add my own views in a separate opinion—for which I make no apology in a case where the far-reaching effects of the majority opinion can scarcely be grasped.

The excerpt in Justice Donaldson's opinion from *Wainscott v. State,* 642 P.2d 1355 (Alaska 1982), is extremely persuasive, and, to my mind, represents the view which I

espoused in our *Dunbar v. United Steel-workers of America,* 100 Idaho 523, 547, 602 P.2d 21, 45 (1979) (Bistline, J., dissenting). The *Wainscott* excerpt is better understood by adding to it the following sentence which follows the excerpt, and by adding also the footnote to the sentence:

"Applying these principles to the case at hand, we conclude that the decision to install flashing red and yellow lights in lieu of a sequential traffic signal constituted a planning level decision.⁴"

"⁴ We emphasize that Wainscott's sole theory of negligence relates to the selection of the traffic control mechanism for the intersection. Wainscott does not allege, and the record does not suggest, that the department negligently designed or improperly positioned the red flashing stop light. *Were this the case, there might be negligence on an operational level,* actionable under AS 09.50.250." 642 P.2d at 1357 (emphasis added).

BISTLINE, Justice, dissenting.

Prior to 1971 Idaho had never had a legislatively created Tort Claims Act. 1971 Idaho Sess. Laws Ch. 150 was the first. Prior thereto all propositions of law governing governmental immunity and governmental liability were case-made. The case-made precedential law hinged around notions of *governmental* functions and notions of *proprietary* functions, a somewhat nebulous distinction and one which many scholars and commentators throughout the entire country—not just Idaho—saw as highly questionable and not always desireable.

All of those problems vanished with the passage of the Tort Claims Act:

"6–903. Liability of governmental entities—Defense of employees.—(a) Except as otherwise provided in this act, every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties, *whether arising out of a governmental or proprietary function,* where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho." (Emphasis added.)

Such legislative action in no uncertain terms did away with the distinction between functions of the State and its political subdivisions which were thought to be governmental and functions which were thought to be proprietary. The legislative action was taken at the invitation of the Supreme Court extended to the legislature in *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970), an opinion which was well-received and widely acclaimed throughout Idaho. Two members of the Court who today sat on this case and join the opinion of Justice Bakes did not join the opinion of Justice Donaldson in *Smith;* they dissented, but did agree that "the issue now before the court is one reserved to the legislature for action." *Smith,* 93 Idaho at 812, 473 P.2d at 954 (McFadden, J., dissenting). The view of Justice McFadden, in which Justice Shepard joined, was that, even though the legislature had not at that time ever entered the field, the *Smith* majority was "entering upon a field that this court has always previously recognized as one reserved to the legislature." *Id.* Worry was expressed as to how a judgment would be satisfied, and it was suggested that lacking was "any *constitutional* provision expressly directing or permitting this Court to depart so radically from its previously uniform holdings . . . ." *Id.* The first of the two dissenting opinions closed with this philosophical caveat:

"Until such time as the legislature, as the representatives of the electors and residents of this state, expand this waiver of governmental immunity, this court should adhere to the doctrine. It is for the legislature, not for the court, to make this change in policy." 93 Idaho at 813, 473 P.2d at 955.

The legislature, of course, did act, and superseded the *Smith* opinion—its language exceeding that in *Smith* by doing away with the distinction between state functions proprietary and state functions governmental. I.C. § 6–903(a), *supra.*

The *Smith* majority was comprised of Justice Donaldson, Justice McQuade, and

Justice Spear. After 1971 Idaho Sess.Laws, ch. 150 became law, Justice Spear retired from the Court. All of this is academic— *Smith*'s effectiveness being superseded by the legislature's Tort Claims Act of 1971— but it sheds illumination on the strange turn of events which unfolds in the Court's opinion today. The *Smith* dissenters, forging with Justice Bakes, have now judicially decimated the legislature's Tort Claims Act.

The *Smith* dissenters, however, were adamant that policy changes in the field of state immunity from suit were for the legislature, 93 Idaho at 813, 473 P.2d at 955, apparently oblivious to the fact that the *Smith* majority specifically yielded policy to the legislature in the first instance. 93 Idaho at 808, 473 P.2d at 950. As mentioned, it was the legislature, not the Court, which gave us the 1971 Tort Claims Act.

Today it is not the *Smith* majority nor the legislature which assumes the mantle of policy-making, but Justice Bakes and the two *Smith* dissenters who twelve short years ago urged otherwise.

In *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979), writing for a majority of the Court, one of the *Smith* dissenters made this statement:

"Hence, although we may derive some scintilla of intent from the legislative language, we are left with the task of deter-

mining and enunciating policy." 100 Idaho at 546, 602 P.2d at 44.

A reading of the entire opinion discloses that the foregoing apparently innocuous statement, which in no way was necessary to a determination of the issue decided, was (as I thought then and continue to believe) simply offered as an excuse for not addressing the issue presented to the Court by the parties. For certain, the opinion did not concern itself with the application of the discretionary exception, I.C. § 6-904(1), which as even Justice Bakes here concedes, was where "the parties in *Dunbar* focused their arguments . . . ."[1] The strange holding of *Dunbar* completely side-stepped the issue in favor of saying that to allow the widows and children of the deceased miners to pursue their claims of wrongful death against the State based on negligent mine inspection "would result in the creation of a new cause of action *which we deem not to be contemplated* by our legislature, and foreign to traditional concepts of the law of torts." 100 Idaho at 546, 602 P.2d at 44 (emphasis added).[2]

Seizing on *Dunbar*'s unwarranted theme that the legislature somehow left policy to the Court, and the Court's own view—and certainly not the legislature's—that a wrongful death action against the State based on negligence in fulfilling its mine

---

1. "As to the State, the [trial] court held that the activity upon which plaintiffs base their claim fell within the discretionary exception to the Idaho Tort Claims Act." *Dunbar,* 100 Idaho at 525, 602 P.2d at 23.

2. The *Dunbar* Court spoke eloquently, but perhaps with inadvertent misunderstanding, in intimating that if it were to find a breach of duty on the part of the State Mine Inspector, it "would result in the creation of a new cause of action . . . ." The cause of action for wrongful death was created by the 1881 Territorial Legislature, since which time it has continued virtually unchanged. *Hogan v. Hermann,* 101 Idaho 893, 623 P.2d 900 (1980) (Bistline, J., concurring).

   Prior to passage of the Tort Claims Act, the State, as a sovereign, was simply immune to being sued; hence the issue presented to the Court in *Dunbar* was not that of the creation of a new kind of action, but whether the discretionary exception of the Tort Claims Act applied so as to retain sovereign immunity. Every-

one involved knew such to be the case, including the author of the Court's opinion:

"We deem it clear that *Smith* did not create a new cause of action, but was rather the abolition of a total defense to an action in the traditional field of tort liability." 100 Idaho at 545, 602 P.2d at 43.

The dissenting opinion was of the same view:

"The only issue before us is whether the action should have been terminated on motions for summary judgment. My vote is that it should not have been. That is not to say that each defendant might not be entitled to a judgment of involuntary dismissal when the evidence has all been presented, but until that has been done, neither this Court nor the trial court are in any position to rule as a matter of law that the widows and children of the deceased miners are without any claim for relief for the losses suffered allegedly by reason of the negligence of the defendants." 100 Idaho at 549, 602 P.2d at 47.

inspection duties was not contemplated by the Idaho legislature, and was foreign to tort law, the author of today's sequel to *Dunbar,* after assuming that firefighting activities of Boise City do have a parallel function in the private sector (not because it is so, but because it is said "there is a great need for some guidance"), jumps directly back into the proprietary function versus governmental function quagmire from which the 1971 legislature had extricated the people of the State. The roundabout meanderings by which the Court gets there are unbelievable, but more unbelievable is the conclusion:

> "It seems apparent that a basic purpose behind the legislature's creation of a list of exceptions to governmental liability was to *limit* the effect of its waiver of sovereign immunity with respect to *gov-*

*ernmental* functions. Such is particularly true with reference to the discretionary function exception under I.C. § 6–904(1). In our view, the purpose behind the discretionary function exception is to preserve governmental immunity from tort liability for the consequences which arise from *the planning and operational decision-making necessary* to allow governmental units to freely perform their *traditional governmental functions."*

In an effort to sustain this untenable conclusion the Court reaches back to the pre-Tort Claims Act case of *Ford v. City of Caldwell,* 79 Idaho 499, 321 P.2d 589 (1958), which is said to fortify that which the majority sees as illustrating the type of result that the legislature *most likely* intended when it passed the 1971 Act.[3] Such is at best but whimsical speculation.

> "While the legislative grant authorizing municipal corporations to establish fire departments (I.C. § 50–1137) is couched in permissive language (I.C. § 50–1101), nevertheless 'A municipal corporation is exercising a governmental function when maintaining and operating a fire department pursuant to legislative authority,' . . .
>
> "The weight of authority is to the effect that a municipality exercises a governmental function in the maintenance of its fire department. . . .
>
> "Since a municipality in the maintenance of its fire department exercises governmental functions it has been held generally that a municipality is not liable for the negligence of officers and servants in connection with its fire department. . . .
>
> "The overwhelming weight of authority is to the effect that a municipal corporation is not liable for torts arising from the defective condition, or negligent construction or operation of its fire fighting facilities and apparatus. . . .
>
> "Particularly, a municipal corporation is not liable for negligence in maintaining a pole extending through a hole in the floor from the firemen's quarters to the fire fighting apparatus on the floor below since such is in the exercise of a governmental function. . . . Such doctrine of nonliability absolves the municipal corporation from liability for negligence of its servants in cases where invitees or licensees are injured by falling through such a hole left unguarded." *Ford v. City of Caldwell,* 79 Idaho 499, 504–06, 321 P.2d 589, 591–93 (1958).

Was it, as a majority of the Court says that it was, the sense of the 1971 legislature in doing

---

**3.** *Ford v. City of Caldwell,* 79 Idaho 499, 321 P.2d 589 (1958), is an excellent refresher course for those members of the Bar whose practice predates passage of the Idaho Tort Claims Act in 1971. For those whose practice commenced after that date, it serves as an excellent example of the state of the law of sovereign immunity as it existed prior to the *Smith* opinion's prodding of the 1971 legislature. One should keep in mind that two highly reputable firms sought to establish the City of Caldwell's liability which—as compared to the facts of the case we review today—had nothing whatever to do with firefighting activities. Rather, the issue at stake was premises negligence; the premises was the second floor of the firehall and an unguarded fire pole standing erect from the first floor and in the middle of a 27-inch hole. The familiar disputes as to proprietary functions vs. governmental function is readily picked up from these excerpts, citations being omitted:

> "The amended complaint alleges that the [8 year old] minor's injuries and damage were proximately caused by the negligence of respondent in inviting and permitting the minor to play in and around the fire station near the open hole in the floor and in failing to protect the minor from the danger of falling through it, when in the exercise of reasonable care respondent knew or should have known of such dangerous condition of its premises.
>
> "It is well established in this jurisdiction that a municipality in the absence of a statute imposing liability is not liable for the torts of its officers and employees occurring in the exercise of a governmental function; it is liable only when acting in a proprietary capacity."
>
> . . . .

More than that, however, the Court announces a holding which extends far beyond the instant case:

"We therefore hold that the discretionary function exception in I.C. § 6–904(1) shields governmental units from tort liability for the consequences arising from the planning and operational decision-making necessary to the performance of traditional *governmental functions.*"

For those who may wonder at what is meant by an *activist court* and search for a definition and not find one, today's majority opinion will at least supply an outstanding example of unbridled judicial activism at its pinnacle. Reaction is back in the saddle, and state immunity from suit for governmental functions as it existed prior to 1971 rides again.

away with the distinction between proprietary function and governmental function, that thereafter severely injured eight year old boys, such as in *Ford,* would be denied any relief whatever for low-level operational negligence in not somehow guarding against open pits in the middle of a room in which such youngsters were invited to come? I think not. Or, is it more likely that the awful result of that case still lingered in the minds of local Treasure Valley legislators when they met in 1971 to consider their response to the *Smith* opinion, and, other than as to certain exceptions, abolished all governmental immunity to being sued by the victims of governmental tort.