727 P.2d 1161

**Verle JONES and Annette Jones, husband and wife, Plaintiffs-Appellants,**

**v.**

**The CITY OF ST. MARIES, a municipal corporation, Defendant-Respondent,**

**and**

**Safeway, Inc., a Maryland corporation, Defendant.**

No. 15745.

Supreme Court of Idaho.

Oct. 15, 1986.

Theodore L. Rupp, Post Falls, for plaintiffs-appellants.

Samuel Eismann, Coeur d'Alene, for defendant-respondent.

DONALDSON, Chief Justice.

Because this case was decided on a motion for judgment on the pleadings, for the purposes of this appeal, we must accept the truth of appellants' allegations. *See, e.g., Davenport v. Burke,* 27 Idaho 464, 473, 149 P. 511, 515 (1915). The facts as stated by the appellants are as follows:

The appellants, Verle and Annette Jones, were the owners of a residence in St. Maries, Idaho. The residence was located immediately adjacent to the southeast corner of the Tubbs building in St. Maries. On Thursday, July 29, 1982, at 12:34 AM, a small fire was discovered at the loading dock on the north end of the Tubbs building. The fire was quickly extinguished and was declared out by 12:45 AM. At about 3:13 AM, a second alarm was sounded and the fire department arrived to find the entire northwest corner of the building in flames. Efforts to provide water to fight the fire were delayed because of debris plugging the screens in the pumper. The debris apparently had been discharged from the fire hydrant or water system. A second fire hydrant had been turned off and the time expended in turning it back on further delayed efforts to extinguish the fire. As a result, the fire spread to the Jones's residence, which was totally destroyed.

The Joneses filed a claim against the City of St. Maries under the Idaho Tort Claims Act (ITCA) alleging that the city was negligent in maintaining its water mains and fire hydrants. The claim was subsequently denied. The Joneses then initiated this action for damages against the city and against Safeway, Inc., the lessee of the Tubbs building. The city moved to dismiss the counts against it on the grounds that the Joneses had failed to allege a Notice of Tort Claim as required by the ITCA, and that the city was immune from liability pursuant to I.C. § 6–904(1), the discretionary function exception to the ITCA. The district court granted the city's motion holding that the city was immune from liability under § 6–904(1) of the ITCA. The Joneses appeal from that decision.

With the enactment of the ITCA, the state of Idaho has subjected itself to negligence liability.

> "6–903. **Liability of governmental entities—Defense of employees.**—(a) Except as otherwise provided in this act, every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties, whether arising out of a governmental or proprietary function, where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho, provided that the governmental entity is subject to liability only for the pro rata share of the total damages awarded in favor of a claimant which is attributable to the negligent or otherwise wrongful acts or omissions of the governmental entity or its employees."

In the recent case of *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755, (1986), we comprehensively discussed the standard of construction and review under the ITCA. There we stated that liability is the rule with certain specific exceptions. *Sterling, supra,* 214–215, 723 P.2d 758–759; *see also, Doe v. Durtschi,* 110 Idaho 466, 716 P.2d 1238, (1986). We further noted that, "Those exceptions which are stated must be closely construed." *Sterling, supra,* 111 Idaho at 215, 723 P.2d at 759.

The instant case involves the so-called "discretionary function" exception to liability which is contained in I.C. § 6–904(1):

"**6–904. Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

"(1) Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."

The district court, in granting the city's motion for judgment on the pleadings, apparently felt that our construction of the discretionary function exception in *Chandler Supply Co. Inc. v. Boise,* 104 Idaho 480, 660 P.2d 1323 (1983), was controlling.

In *Chandler,* the plaintiff, Chandler Supply Company, brought suit against the city of Boise alleging that the Boise Fire Department was negligent in failing to completely extinguish a fire which ultimately spread to the plaintiff's property, resulting in substantial damage thereto. The trial court refused to hold the city immune from liability under the discretionary function exception to the ITCA and the jury returned a special verdict finding the city 75% negligent. On appeal, this Court reversed holding that,

"The discretionary function exception in I.C. § 6–904(1) shields governmental units from tort liability for the consequences arising from the planning and operational decision-making necessary to the performance of traditional *governmental* functions. Since the action in the present case is based upon a claim of negligence with regard to the operational decisions of city firemen in fighting a fire, a traditional governmental function,

the action is barred under I.C. § 6–904(1)." *Chandler, supra* at 486, 660 P.2d at 1329. (Emphasis in original.)

The trial court felt the circumstances of the instant case were indistinguishable from those in *Chandler* and granted the city's motion to dismiss on that basis.

"I have a very difficult time in my mind distinguishing this case from the Chandler case or the Dunbar case for that matter, when you are talking about the actual maintenance of the firefighting apparatus, which I would think the hydrant system would be. Clearly to me the maintenance of a hydrant system is done for the same purpose as maintenance of a fire truck, or maintenance of anything else that goes along with it, I surely think it all falls into the scope of a governmental function. And, likewise, I think that probably the inspection and duties that go along with enforcement of ordinances, or codes, or whatever you might have involved, is certainly governmental function, I simply can't distinguish that.

. . . .

"To me whether we are talking about maintenance of the hydrant system, maintenance of a fire truck, method of fighting the fire, response time, whatever might be involved, or the method of protecting against the fire in the first place by imposing inspections under rules and ordinances and code, and thereafter in enforcing them, all fall within the same governmental function.

"I simply can't distinguish in my mind between those. So on that ground, I think I have no choice but to—accepting all of the allegations in the complaint as true—to grant the Motion to Dismiss."

[1] The trial court was, of course, acting without the benefit of our recent decision in *Sterling v. Bloom, supra,* in which we adopted the "planning/operational test" for determining whether a particular governmental action is discretionary and therefore immune under I.C. § 6–904(1). The planning/operational test provides immunity for planning activities—activities which

involve the establishment of plans, specifications and schedules where there is room for policy judgment and decisions. Operational activities—activities involving the implementation of statutory and regulatory policy—are not immunized and, accordingly, must be performed with ordinary care. *Sterling, supra* 111 Idaho at 229–30, 723 P.2d at 773–74.

*Sterling* specifically rejected the "traditional governmental function" analysis employed in *Chandler.*

"Without any reference to authority, *Chandler* held that the discretionary function exception to immunize decision-making was '*necessary* to allow governmental units to freely perform their *traditional governmental functions.*' *Chandler, supra,* 104 Idaho at 485, 660 P.2d at 1328 (emphasis in original). Nothing in the definition of 'discretion' and nothing in the entire framework and scheme of the Tort Claims Act itself provides even an inkling of any possible reference to 'traditional governmental functions.' To the contrary, the exercise of choice and judgment and the making of responsible decisions take place daily in all human activities. The United States Supreme Court specifically rejected such a derivation. [*Union Trust Co. v.*] *Eastern Airline, supra,* 350 U.S. 907, [76 S.Ct. 192, 100 L.Ed. 796 (1955)] *explained in [United States v.] Varig [Airlines], supra,* [467 U.S. 797,] 104 S.Ct. [2755] at 2764–65 [81 L.Ed.2d 660 (1984)]. Most importantly, and as previously illustrated, such a derivation would convert to mere surplusage those expressly enumerated exceptions found in I.C. § 6–904 which involve 'traditional' governmental functions. *Chandler, supra,* 104 Idaho at 488, 660 P.2d at 1331 (Donaldson, C.J., dissenting). We hold that the discretionary function exception does not extend immunity on the basis of certain governmental functions having been in pre-1971 days judicially described as 'traditional.' " *Sterling, supra* at 231, 723 P.2d at 775. (Emphasis in original.)

■ The trial court, acting without the benefit of *Sterling,* concluded that the maintenance of the water mains and fire hydrants at issue in the present case was part of the traditional governmental function of fire fighting and held the city immune from tort liability on that basis. A proper analysis, however, should have focused not on the status of the actors as firefighters, but rather on the nature of the conduct alleged. A court must look at the particular conduct alleged in order to determine whether that conduct involved the exercise of discretion. *Sterling, supra,* 111 Idaho at 229–30, 723 P.2d at 773–74.

■ Turning, then, to the allegations of negligence in the instant case, the Joneses have alleged that the city "was negligent in inspecting and maintaining the fire hydrants and fire mains within the city of St. Maries, which negligence caused a delay in the fire-fighting efforts of the St. Maries' fire department and resulted in the spread of said fire in the 'Tubbs Building' to Plaintiffs' property." For the purposes of this appeal, defendants are deemed to have admitted the truth of these allegations. The issue thus becomes whether the city's negligent failure to maintain its fire hydrants and water mains in proper working order involved planning or operational activity. Only if it involved the former is the city immune from liability pursuant to I.C. § 6–904(1).

It is not possible, however, to discern from the record before us the precise nature of the conduct complained of and, therefore, we are unable to determine whether that conduct was planning or operational. The Joneses' allegation that the city was negligent in inspecting and maintaining fire hydrants and water mains alone is not determinative. If, for example, the evidence on remand indicates that the city, due to budgetary constraints or other factors, made a policy decision not to inspect its water mains and fire hydrants, such a decision would be discretionary, as it would involve planning rather than operational activity, and the city would be immune from liability even if the decision was

negligently made. If, on the other hand, the evidence indicates that the city had, in fact, assumed the responsibility for inspecting and maintaining the fire hydrants and water mains at issue, then it would be obligated to perform those activities with due care and would be correspondingly liable for any failure to do so. In short, the pleadings alone fail to establish whether the city's conduct was "planning" or "operational" as we defined the terms in *Sterling, supra.*

Given the limited nature of the facts before it, it was error for the district court to hold that the city was entitled to immunity under the "discretionary function" exception, I.C. § 6–904(1). Accordingly, the judgment of the district court granting the state's motion for dismissal on the pleadings is reversed and this case is remanded for further proceedings consistent with the views expressed herein.

Judgment reversed.

Costs to appellants.

BISTLINE and HUNTLEY, JJ., concur.

HUNTLEY, Justice, concurring.

The dissent of Justice Shepard compels me to sound a note of caution to those who might read it without familiarity with the statutory and case law development, which background is necessary to a proper interpretation of the Idaho Tort Claims Act (ITCA). Under informed scrutiny the dissent evinces no merit.

## INTRODUCTION

Today's opinion, in which I fully join, quite correctly remands this case for the development of a record sufficient to permit the application of *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986). The decisions of this Court controlling at the time of the district court's decision—*Chandler v. City of Boise,* 104 Idaho 480, 660 P.2d 1323 (1983), *overruled in Sterling, supra;* and *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979) *cert. denied* 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839, *overruled in Ster-*

*ling, supra*—had not required the district court to consider many facts in order to render its decision. Indeed, applying the holding of *Chandler,* all the court would have needed to consider was that a governmental entity was the defendant in order to find immunity from liability. As we noted in *Sterling, Chandler's* holding that the government was immune when engaged in both planning and operational functions seemingly "excepts *all* government functions. Beyond planning a governmental action, and putting it into operation, what else does a government do in its total function of governing?" *Sterling, supra,* 111 Idaho at 227, 723 P.2d at 771.

Justice Shepard's dissenting opinion is not so much a dissent to today's decision, to which it devotes little attention, as it is a latter-day assault on *Sterling.* The majority and concurring opinions to *Sterling* readily answer the dissent's substantive assertions. Nevertheless, because the dissent sounds false alarms as to potential governmental liability under *Sterling,* and advocates a dangerously adventuristic and activist approach to the construction of the ITCA, I feel it advisable to respond.

The dissent apparently would have this Court return to "the task of determining and enunciating policy," as it was put in *Dunbar, supra,* 100 Idaho at 546, 602 P.2d at 44, without regard for the plain meaning of the language of the ITCA or for the construction of the Federal Tort Claims Act (FTCA) on which the ITCA was patterned. At no point does the dissent so much as acknowledge the ITCA's language, perhaps because that language is fatal to the policy the dissent would "enunciate." Nor does the dissent properly acknowledge the federal case law which predated the Idaho legislature's adoption of much of the FTCA. Rather, the dissent endeavors to obfuscate what are in reality unmistakably clear federal rulings regarding the key provisions of the FTCA, 28 U.S.C. §§ 1346, 2674, and 2680(a), primarily by confusing the provisions at issue in individual cases, and by characterizing the results of individual cases without examining their analyses.

In contrast with the dissent, a majority of this Court persists in reading the language of the ITCA and recognizing the federal constructions of the same language—constructions entrenched for over fifteen years prior to the passage of the ITCA and undoubtedly known to the Idaho legislature. Put another way, we persist in leaving the "determining and enunciating [of] policy" to the legislature.

## I. PARALLEL FUNCTIONS REVISITED

The dissent asserts that neither the Idaho nor the Federal Acts intended "to create new causes of action, but rather intended only to remove the bar to liability when government agents or servants engaged in activity which would be delineated as tortious if the actor were a private individual." What the dissent fails to appreciate is that *Sterling* construed I.C. § 6–903(a) to do no more than that: "[T]he language [of I.C. § 6–903(a) ] has always stated that if a private person or entity would be liable, so then, will be the government." *Sterling, supra,* 111 Idaho at 223, 723 P.2d at 767.[1]

The dissent apparently persists in the *Dunbar* position that the ITCA intended to provide no new liability against the government at all. As we explained in *Sterling,* such an argument deprives the ITCA of its very purpose: "to waive the government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." *Rayonier, Inc. v. United States,* 352 U.S. 315, 319, 77 S.Ct. 374, 377, 1 L.Ed.2d 354 (1957), *quoted in Sterling, supra,* 111 Idaho at 222, 723 P.2d at 766.

While the government's liability is "novel and unprecedented," there is nothing "novel and unprecedented" about the cause of action asserted in the instant case, that of negligence. Consequently, all *Sterling* did was exactly what the dissent advocates to-

day, *i.e.,* "remove the bar to liability when government agents or servants engaged in activity which would be delineated as tortious if the actor were a private individual." *See Sterling, supra,* At 222, 723 P.2d at 766.

Nevertheless, despite the apparent agreement between the dissent's summary characterization of the ITCA's basic purpose and that found in *Sterling,* the dissent clings to the *Dunbar* assertion that "governmental" functions without parallel in the private sector ought not be subject to liability, or, as the dissent likes to phrase it, that "it is not a tort for the government to govern." *See Dunbar, supra,* 100 Idaho at 546, 602 P.2d at 44 (There the idea was expressed similarly: "We do not ascertain an intent to create a new cause of action against a governmental entity for its attempts to govern."). Ironically, the dissent cites for support Justice Traynor's *Muskopf v. Corning Hospital District,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961). While Justice Traynor quoted the same phrase originated by Justice Jackson, his explanation of its meaning differs diametrically from the dissent's. Justice Traynor wrote:

> Although it "is not a tort for government to govern" (Jackson, J., dissenting in *Dalehite v. United States,* 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427), and *basic policy decisions of government within constitutional limitations are therefore necessarily nontortious, it does not follow that the state is immune from liability for the torts of its agents.* These considerations are relevant to the question whether in any given case the state through its agents has committed a tort (see 3 Davis, Administrative Law (1958), § 25.11, p. 482, § 25.-13, p. 489), but once it is determined that it has, it must meet its obligations therefor.
>
> . . . .

---

[1] I agree with the dissent that whether or not a tort was committed is the proper beginning point to analysis under the ITCA. In *Sterling,* before examining the discretionary function exception, this Court devoted careful attention to the question of whether a private person would be liable under Idaho law for the sort of negligent supervision alleged in that case. *Sterling, supra,* 111 Idaho at 222–26, 723 P.2d at 766–70.

*Government officials are liable for the negligent performance of their ministerial duties* (*Mock v. City of Santa Rosa,* 126 Cal. 330, 334, 58 P. 826; *Payne v. Baehr,* 153 Cal. 441, 444, 95 P. 895) *but are not liable for their discretionary acts within the scope of their authority.* . . . *Id.* 11 Cal.Rptr. at 94, 359 P.2d at 462 (emphasis added; some citations omitted).

Clearly, Justice Traynor contemplated immunity only for policy-making functions and not for "ministerial" or "operational" duties, a dichotomy indistinguishable from the discretionary function planning-operational test as found in the federal case law and adopted in *Sterling.* Just as clearly, Justice Traynor focused on this distinction alone, and visualized no exception to liability for "uniquely governmental" activities.

Not only is the "uniquely governmental-parallel function" exception unsupported by Justice Traynor's *Muskopf* opinion, but also it is expressly rejected by the plain language of the ITCA, is inconsistent with the structure of the ITCA (as it purportedly arises out of I.C. § 6–903(a) instead of the provision on exceptions, I.C. § 6–904), runs counter to the federal case law concerning the analogous provisions of the FTCA, and defies common sense. We documented as much in the majority and concurring opinions in *Sterling, supra,* 111 Idaho at 215–23, 233–38, 723 P.2d at 759–67, 777–82. Today's dissent offers no answer to that documentation; nor does it offer any authority or rationale for the "uniquely governmental-parallel function" test.

It is possible, though not clear, that the dissent sees support for its position in two of the federal cases it discussed, *Jayvee Brand, Inc. v. United States,* 721 F.2d 385 (D.C.Cir.1983) and *Warren v. District of Columbia,* 444 A.2d 1 (D.C.Ct.App.1981). If so, the dissent's reliance is misplaced.

In *Jayvee,* the plaintiffs, manufacturers of children's sleepwear, alleged that the Consumer Product Safety Commission (CPSC) had negligently failed to follow the procedures required prior to making the concededly discretionary decision to ban garments treated with a certain flame retardant. *Jayvee, supra,* 721 F.2d at 387–89. Judge Bork, without either of his fellow panel members concurring in his reasoning, found those procedures to be "integral to the decision to adopt the substantive regulation" and thus an alleged abuse of discretion shielded from liability by the discretionary function exception. *Id.* at 389.

Alternatively, again without the co-panelists' concurrence in his reasoning, Judge Bork posited that the CPSC was immune for wrongful acts committed in the course of its quasi-legislative or quasi-adjudicative actions in promulgating regulations, since there was no such liability in the private sector. Judge Bork was careful to stop short of the dissent's and *Dunbar*'s position:

> The Supreme Court has made clear its desire to avoid the " 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations." *Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955). Our holding today does not draw us into this quagmire. Whether a particular action is a "quasi-legislative" or "quasi-adjudicative" one is a judicial judgment frequently made. *See, e.g., infra* pp. 394–395. It is a judgment involving very different factors than those employed in determining whether an action is on the "operational level" of governmental activity. *See, e.g., Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (operating a lighthouse); *Rayonier Inc. v. United States,* 352 U.S. 315, 317–19, 77 S.Ct. 374, 375–76, 1 L.Ed.2d 354 (1957) (fighting fires); *Downs v. United States,* 522 F.2d 990, 997 (6th Cir.1975) (attempted stopping of a hijacking). *Id.* at 390.

Judge Bork apparently attempted to carve out a narrow exception to, and as a consequence probably contravened, the rule of *Indian Towing* that the extent to which a governmental function can be construed as

"governmental" is irrelevant to the rule of liability under 28 U.S.C. §§ 1346(b) and 2674. Since neither of his co-panelists agreed to the proposed exception, it lacks precedential effect even in the District of Columbia Circuit. Nevertheless, even Judge Bork's proposed rule would have no application to the instant case. Furthermore, since it postdates the ITCA's passage, it could not have confused the drafters of the ITCA.

Judge Bork's comment that "the entire thrust of the FTCA is in a different direction from that appellants would have us give it: 'Uppermost in the collective mind of Congress were the ordinary common-law torts,'" *Jayvee, supra,* 721 F.2d at 392 (quoting *Dalehite*), and the similar comments of Judge Lumbard in concurrence, lack the breadth the dissent would attribute to them. The comments were in response to the plaintiffs' novel theory that the CPSC ought to be held liable for failing to properly follow statutorily prescribed procedures, even though the resulting regulations were shielded by the discretionary function exception. *Id.* at 391–92. No such novel theory is advanced in the instant case.

The *Warren* case is quickly disposed of. That court simply held that police protection is a duty "owed to the public at large, and, absent a special relationship between the police and an individual, no specific legal duty exists." *Warren, supra,* 444 A.2d at 3. This holding does not conflict with that of *Sterling,* since in *Sterling* a special relationship did exist by virtue of the probation officer's supervision of Bloom. *Sterling, supra,* 111 Idaho at 225,

723 P.2d at 769 *see also id.* At 243, 723 P.2d at 787 (Huntley, J., concurring). Moreover, the FTCA was *not specifically discussed* in *Warren.* And in any event, *Warren,* like *Jayvee,* post-dates the ITCA; thus, it is unpersuasive as to the legislative intent behind the ITCA.

The best the dissent manages is an attempt to discredit the leading United States Supreme Court decision which debunked the "uniquely governmental" test, *Indian Towing, supra.*[2] Far from "neglect[ing] the first step of the analysis, *i.e.,* whether the acts complained of constituted a tort," *Indian Towing* directly addressed and correctly determined that where the government "undertakes to warn the public of danger and thereby induces reliance [it] must perform [its] 'good Samaritan' task in a careful manner," just as a private individual under like circumstances would be obligated. *Id.* 350 U.S. at 64–65, 76 S.Ct. at 124. The Court elaborated:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable

2. The dissent fails to account for other Supreme Court decisions which affirmed the holding of *Indian Towing,* including *Hatahley v. United States,* 351 U.S. 173, 180, 76 S.Ct. 745, 751, 100 L.Ed. 1065 (1956), and *Lockheed Aircraft Corp. v. United States,* 460 U.S. 190, 198, 103 S.Ct. 1033, 1038–39, 74 L.Ed.2d 911 (1983). The most recent reaffirmation came in *United States v. Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, 2764–65, 2765 n. 10, 81 L.Ed.2d 660 (1984). The *Varig* Court did not arbitrarily reject "the application of the *Indian Towing* good Samaritan doctrine to the actions of the government in *Varig,*" as the dissent suggests. Instead, the Court held that the government was immune under the discretionary function exception when deciding as a matter of policy what aspects of certain aircraft designs to inspect. *Varig, supra,* 104 S.Ct. at 2768. Had the allegations involved negligent inspection instead of "negligence in failing to check certain specific items" in the aircraft designs—items which the government determined in its "policy judgment" need not be checked, *id.* at 2768–69—then the discretionary function exception would not have applied, and the "good Samaritan" duty would have attached.

under the Tort Claims Act. *Id.* at 69, 76 S.Ct. at 126–27.

The dissent complains that "not a single scrap of authority was cited" for this proposition. If the dissent is referring to the "good Samaritan" rule, then the dissent is ineffectually nitpicking. As the Supreme court noted without any reasonable dispute, the "good Samaritan rule" as stated is "hornbook tort law." *Id.* at 64–65, 76 S.Ct. at 124. If the dissent is referring to the fact that the government previously had not been held liable for such negligence, then the dissent's point is nonsensical. The Supreme Court had all the authority it needed and all that was available at the time, the language of 28 U.S.C. § 2674. That language made the government potentially liable where "a private person under like circumstances would be liable," and not merely where private persons perform identical functions to those of the government. Of course, there was no authority predating the still new FTCA; until its passage, sovereign immunity had stood as a bar to any claim.

In arriving at this construction of the FTCA provisions establishing the bounds of governmental liability, 28 U.S.C. §§ 1346(b) and 2674, the *Indian Towing* Court resoundingly rejected the government's argument that those provisions "must be read as excluding liability in the performance of activities which private persons do not perform. Thus, there would be no liability for negligent performance of 'uniquely governmental functions.'" *Indian Towing, supra,* 350 U.S. at 64, 76 S.Ct. at 124. The Court hardly was "setting up and then destroying a straw man," as the dissent asserts *ipse dixit,* but rather was

responding directly to the government's position. The government was attempting to read into the FTCA the same "non-governmental-governmental" distinction which the dissent would read into the ITCA. The Supreme Court, with trenchant reasoning, demonstrated there to be no basis in the FTCA or in reason for this "inherently unsound" test. *Id.* at 65, 76 S.Ct. at 124.[3] As we explained in *Sterling,* neither is there any basis for it in the ITCA. *Sterling, supra,* 111 Idaho at 216, 723 P.2d at 760.

Beyond this, the dissent still cannot face up to the language of I.C. § 6–903(a) which extinguishes any possibility that the Idaho legislature intended or even left room for a "governmental" exception to liability.[4] As explained in *Sterling:*

> Presumably aware of the [*Indian Towing*] Supreme Court's having equated the uniquely governmental/parallel function test with the proprietary/governmental distinction, the Idaho legislature inserted the following language into I.C. § 6–903(a): "the governmental entity is subject to liability ... *whether arising out of a governmental or proprietary function....*" (Emphasis added.) As *Indian Towing* teaches, uniquely governmental functions are bound to equate with those traditionally viewed as "governmental" functions, while those functions similar to ones performed by private persons and entities would equate with those traditionally viewed as "proprietary." 350 U.S. at 66–67 [76 S.Ct. at 125–26]; *Hall, supra,* at 211, 230. But, whether or not fertile minds are able to concoct a "uniquely governmental function" that was not a "governmental func-

3. The attempts of today's dissent and the *Sterling* dissent to portray the *Indian Towing* decision as "perfunctory" and "terse" are laughable. The opinion is a cogently reasoned gem, a characteristic work by one of the giants of American jurisprudence, Justice Felix Frankfurter. Perhaps these dissents find it easy to fault *Indian Towing* in grossly general terms because they never examine (much less refute) its rationale.

4. I.C. § 5–330, cited in the dissent, does not indicate the legislature's intent to abrogate the "good Samaritan" doctrine in *all* circumstances,

but only where persons who "offer[ ] and administer[ ] first aid or medical attention to any person or persons injured" in an accident. This of course would include governmental employees who rendered such aid. Obviously, this grant of immunity extends no farther than accident scenes and offerers of first aid. For example, it provides no immunity to a governmental entity charged with the supervision of persons with known dangerous propensities. *Sterling, supra,* 111 Idaho at 224–26, 723 P.2d at 768–70.

tion" under the law of municipal corporations misses the point; what matters is that the Supreme Court unequivocally (1) saw the proposed exception to be the governmental/proprietary distinction in disguise, and (2) rejected it. In using essentially the same language as found in the Supreme Court's discussion of the provision of the Federal Act analogous to I.C. § 6–903(a), the Idaho legislature also must have equated a proposed "uniquely governmental function" with the proprietary/governmental distinction, which it then expressly rejected. *Accord, Hall, supra,* at 220–22, 228–35; *see also Ryan v. State,* [134 Ariz. 308] 656 P.2d 597, 598 (Ariz.1982) ("Here the appellee-respondents urge that governmental immunity should continue in those instances where the services provided are uniquely governmental in nature. This is the old proprietary-governmental distinction in a bright new word-package."). *Sterling, supra,* at 219–20, 723 P.2d at 763–64 (footnote omitted).

Curiously, the dissent approves of the Supreme Court decision which followed by two years and expressly reaffirmed *Indian Towing—Rayonier Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). *Rayonier* bears quoting one more time:

These provisions [28 U.S.C. §§ 1346(b) and 2674], given their plain natural meaning, make the United States liable to petitioners for the Forest Service's negligence in fighting the forest fire if, as alleged in the complaints, Washington law would impose liability on private persons or corporations under similar circumstances.

Nevertheless the Government, relying primarily on the Dalehite case, contends that Congress by the Tort Claims Act did not waive the United States' immunity from liability for the negligence of its employees when they act as public firemen. *It argues that the Act only imposes liability on the United States under circumstances where governmental bodies have traditionally been responsible for the misconduct of their employees and that neither the common law nor the law of Washington imposes liability on municipal or other local governmental for the negligence of their agents acting in the "uniquely governments" capacity of public firemen.* But as we recently held in *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, [100 L.Ed. 48], the test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred. We expressly decided in Indian Towing that the United States' *liability is not restricted to the liability of a municipal corporation or other public body and that an injured party cannot be deprived of his rights under the Act by resort to an alleged distinction, imported from the law of municipal corporations, between the Government's negligence when it acts in a "proprietary" capacity and its negligence when it acts in a "uniquely governmental" capacity.* To the extent that there was anything to the contrary in the Dalehite case it was necessarily rejected by Indian Towing. *Id.* at 318–19, 77 S.Ct. at 376–77 (emphasis added, footnotes omitted).

Quite obviously, *Rayonier,* like *Indian Towing* before it, rejected the dissent's proposed exception for "governmental" functions. Quite clearly, in the eyes' of the United States Supreme Court, as in the words of the drafters of the ITCA, *see* I.C. § 6–903(a), it *can* be a tort for the government to negligently carry out "governmental" functions.

Much more could be and has been said on the uniquely governmental-parallel function exception. For present purposes, it is enough to say that it is an exception without basis in the language of the ITCA, in the federal case law, or in reason. The best that can be said about this concocted exception is that it is now defunct.

## II. THE DISCRETIONARY FUNCTION EXCEPTION

While the dissent apparently would affirm on the basis of I.C. § 6–903(a), it

nevertheless takes the opportunity to assail the holding of *Sterling* on I.C. § 6–904(1), popularly called the "discretionary function exception." Interestingly, the dissent offers no construction of its own for the provision but contents itself with criticising the planning-operational dichotomy. Its criticism, however, appears to be confined. to the results obtained under the federal construction in selected cases. The dissent offers nothing to refute that (1) the construction springs naturally from the language and structure of I.C. 6–904(1) and its comparable federal provision, 28 U.S.C. § 2680(a) as well as from the legislative history of the latter, and (2) that it prevailed at all levels of federal jurisprudence at the time the ITCA was enacted. *See Sterling, supra,* 111 Idaho at 226–30, 723 P.2d at 770–74.[5]

Those few cases which the dissent believes illustrate inconsistency among the federal courts in reality do just the opposite when more closely examined. *Smith v. United States,* 375 F.2d 243 (5th Cir.) *cert. denied* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967) did not involve mere allegations of "failure to protect a federal juror" as the dissent suggests, but rather involved allegations that the United States Attorney General was negligent for failing to exercise the discretion to prosecute an alleged violation of 18 U.S.C. § 1503 (concerning the influencing, intimidating, or impeding of federal jurors). As the Court of Appeals holding reflects, *Smith, supra,* 375 F.2d at 248, the decision to prosecute falls neatly within the bounds of a "planning" function, as it involves "room for policy judgment and decision." *Dalehite, supra,* 346 U.S. at 36, 73 S.Ct. at 968. The federal courts *consistently* so hold. *See generally,* 28 U.S.C.A. § 2680 note 27.

*Martin v. United States,* 546 F.2d 1355 (9th Cir.1975), also exemplifies straightforward application of the planning-operational test. The *Martin* plaintiffs alleged the National Park Service had negligently de-

cided to close certain garbage dumps where grizzly bears were feeding. These closings allegedly led to a bear attacking a camper. The Court of Appeals held:

> We are convinced that the acts of the Park Service or Interior Department employees which Dr. Craighead said constituted negligence are within the protection of 28 U.S.C. § 2680(a) and the discretionary function rule enunciated in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). That case held that various decisions with respect to instituting a fertilizer export program, conducting further experiments regarding the combustibility of the fertilizer, and decisions regarding bagging temperature, bag labeling, fertilizer coating and bagging material were all made at a planning rather than operational level. The case specifically states that "all employees exercising discretion" are covered by the Act. *Id.* at 33, 73 S.Ct. 956. The summary of the record shows that the decision to abruptly close the garbage dumps was likewise made at the planning level. Superintendent Anderson, who issues the regulations and who made the decisions of which plaintiff and Dr. Craighead complain, was making a policy judgment. Even Dr. Craighead agreed at the trial that the handling of bears is a matter of judgment and someone must apply it. *Id.* at 1360.

*Downs v. United States,* 522 F.2d 990 (6th Cir.1975), which the dissent implies is somehow inconsistent with the preceding two cases, is actually quite in line. *Downs* did not involve a policy decision to prosecute, like *Smith,* or an issuance of regulations like *Martin,* but instead involved allegations of negligence in *carrying out* the FBI's policy on handling hijackings. *Id.* at 997. As the Court of Appeals described them, these were "operational" level ac-

---

5. The dissent's criticism of *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) ignores these sound bases for the planning-operational test, and apparently presumes that the sole criterion for liability under the FTCA ought to be whether or not "private producers" would be liable.

tions devoid of the policy implications found in *Smith* and *Martin.*

Likewise, *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974) and *First National Bank in Albuquerque v. United States*, 552 F.2d 370 (10th Cir.1977), *cert denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96, are readily reconciled. The *Griffin* plaintiffs alleged that a particular "lot" of polio vaccines had been released in violation of standards set in federal regulations; they did not challenge the regulations themselves. *Griffin, supra*, 500 F.2d at 1062–64. This alleged wrongdoing the Court held to fall outside the discretionary function exception. *Id.* at 1068–69. In contrast, the *First National Bank in Albuquerque* plaintiffs alleged that the Pesticides Regulation Division of the Department of Agriculture had been negligent in determining pursuant to statute and regulations the necessary warnings to accompany a certain type of fungicide. 552 F.2d at 371–72. This was a policy judgment applicable to all future lots of the fungicide, not an individual slip-up as in *Griffin.* The Court of Appeals effectively explained the distinction with *Griffin:*

> Thus the statute and the regulations staked out only generalized policy standards for the precautions, warnings and directions for use. To enforce these standards, and give content and meaning to them, *the agency was required to make policy judgments in evaluating the adequacy of the labeling.* See *Stearns Electric Paste Co. v. EPA*, 461 F.2d 293, 310 (7th Cir. [1972]); *Continental Chemiste Corp. v. Ruckelshaus*, 461 F.2d 331, 336 (7th Cir. [1972]). We feel this is true as to all components of the labeling complained of by the plaintiffs—the warnings, precautions and directions for use. *Thus this case is unlike Griffin where scientific measurement against given specific standards was involved—not a determination in general terms for the protection of the public safety. Id.* at 376 (emphasis added, footnote omitted).

Of course, even if these two cases had been inconsistent, this would have posed no problem to the 1971 Idaho legislature. Like *Martin* and *Downs*, they were decided in the mid–70's.

Whether or not the results of these cases can be characterized as inconsistent, the analyses are generally compatible. Even if they were not consistent, they would not have confused the 1971 legislature, since only one was decided prior to 1971. Moreover, they are but five of literally hundreds of decisions dealing with the discretionary function exception. Far from constituting a "crazy quilt," these decisions apply the exception and the *Dalehite, Indian Towing*, and *Rayonier* holdings with impressive uniformity. *See Sterling, supra*, 111 Idaho at 229–30, 723 P.2d at 773–74. Of course the legislature had to be aware of the prevailing construction of this, exception (as well as 28 U.S.C. § 2674). Had the legislature disapproved of this construction, it surely would not have adopted almost verbatim the language from which the construction so readily had sprung.

At one point, the dissent goes so far as to suggest that *Dalehite* is inconsistent with *Indian Towing* and *Rayonier.* We have already shown, as did the United States Supreme Court in *Varig Airlines, supra*, 104 S.Ct. at 2763–65, that these cases pose no unresolved inconsistency, so long as one realized which section of the FTCA was at issue in which part of each opinion. *See Sterling, supra*, 111 Idaho at 216–19, 723 P.2d at 760–63, *see also id.* at 236–37, 723 P.2d at 780–81 (Huntley, J., concurring).

In its ill-founded attempt to debunk the planning-operational test, the dissent loses sight entirely of the important function of the discretionary function exception. The dissent attacks the *Dalehite* holding in the following fashion:

> The [*Dalehite*] majority held that the specific acts of negligence, "were all reasonably made at a planning rather than an operational level and involved considerations more or less important to the practicability of the government's fertilizer program." For example, as to the

bagging temperature it was held, "[i]t would be possible to keep the product in the graining kettles for a longer period or to install cooling equipment. But both methods would result in greatly increased production costs and/or greatly reduced production." Such seems to be a bizarre approach since certainly such excuses would not be heard or tolerated from private producers.

The dissent's criticism completely misses the mark. Whether or not private producers would be held liable is *irrelevant* to discretionary function analysis; whether or not the governmental action involved policy judgment is the question. The thrust of the discretionary function exception is to shield the government from liability when it is involved in policy judgments affecting such matters as "production costs" and quantity of production, even if a private producer would be liable. *Sterling, supra,* at 230–31, 723 P.2d at 774–75. The dissent apparently is so taken with its concept of liability contingent on how "governmental" the government is behaving that it would read the discretionary function exception out of existence.

Policy judgments potentially impact upon vast segments of society. If negligently formulated, such decisions may do widespread harm. This was the case in *Dalehite.* The high-level decisions made in *Dalehite* were dictated by funding and productivity considerations and guided a nationwide, urgent governmental effort. Even so, the dissent seemingly would have thrown the government open to liability, based upon the fortuity of "non-uniqueness" as formulated in the mind of some judge. Here is the potential for "limitless" liability; here is a test—the "uniquely governmental-parallel function" test—capable of manipulation and devoid of precedents from which to draw.

In the final analysis, the dissents' criticism of the planning-operational test is of

no consequence. There is no doubt, apparently even to the dissent, that the planning-operational test did originate in *Dalehite* and prevail in the federal case law prior to 1971.[6] To presume the legislature was unaware of this test is tantamount to presuming the legislators were illiterate.

### III. HORIZONS TO LIABILITY

The dissent's vague and conclusory claim that there is "no end or limit to the liability potential of governmental entities" ignores the clear limits found (where one would expect them to be found) within the express exceptions to the liability established in the ITCA. In fact, the limit established in the discretionary function exception may well apply in this very case. As the majority opinion explains, the city will be immune from liability for policy decisions regarding the inspection of fire hydrants and water mains. The immunity springs from the second clause of the discretionary function exception. I.C. § 6–904(1); *see Sterling, supra,* at 229–30, 723 P.2d at 773–74. Further, if the city's employees acted with ordinary care and in accordance with these policy decisions in carrying them out, no liability may result, even if the policy decisions were negligently made. This immunity springs from the first clause of the discretionary function exception. *Id.* However, if the employees failed to use "ordinary care" in carrying out the city's policy (for example, by inspecting the hydrants in negligent fashion, or failing to inspect them as the city had directed), then the discretionary function exception may not afford immunity. In short, the horizons of the government's liability are not "limitless"; rather, they are immediately before us, precisely where the legislature placed them.

The discretionary function exception affords similar answers to the dissent's various fears.[7] The dissent fears that liability may result from decisions to arrest and

---

**6.** The test prevails still in many federal courts. *See, e.g., Henderson v. United States,* 784 F.2d 942 (9th Cir.1986); *Alabama Electric Cooperative, Inc. v. United States,* 769 F.2d 1523 (11th Cir.1985).

**7.** Of course, the other express exceptions to liability also will bar certain claims. I.C. § 6–904.

prosecute, but such decisions have been held immune under the discretionary function exception. *E.g., Smith, supra,* 375 F.2d at 248; *see generally,* 28 U.S.C.A. § 2680 note 27. The dissent fears liability leaping out of negligent regulation of various businesses, but under the discretionary function exception, regulatory activity involving policy judgment has been held immune. *E.g., Varig Airlines, supra,* 104 S.Ct. at 2769; *First National Bank in Albuquerque, supra,* 552 F.2d at 376; *see generally* 28 U.S.C.A. § 2680 notes 13 and 13a. Providing such information as weather forecasts also has been shielded from liability, *see generally* 28 U.S.C.A. § 2680 note 37; again, the dissent's fears are misplaced.

Most mistaken is the dissent's concern that decisions constrained by budgetary considerations could result in liability. This concern is not a little ironic, since the dissent derided the *Dalehite* Court for taking the same concern into account. Nevertheless, as *Dalehite* demonstrates, policy judgments based on budgetary limitations are the epitome of those properly delineated as "discretionary." *Dalehite, supra,* 346 U.S. at 40–41, 73 S.Ct. at 970–71; *Varig Airline, supra,* 104 S.Ct. at 2768.

As demonstrated by the *Dalehite* result—one with which the dissent takes issue—the construction of the discretionary function exception in *Sterling* may permit *less* governmental liability than would the dissent's approach. Under *Sterling,* the discretionary function exception will shield discretionary conduct even where such conduct is not "uniquely governmental." *See Sterling, supra,* at 237, 723 P.2d at 781 (Huntley, J., concurring). For example, a

governmental agency engaged in the function of rehabilitating disabled and injured persons, a function readily paralleled by those of Deseret Industries and Elks Rehabilitation Hospital, arguably would be subject to liability even for "planning" decisions under the dissent's formulation of the ITCA. Such decisions would appear to be immunized under *Sterling*'s construction of the discretionary function exception.[8]

## CONCLUSION

The *Sterling* holding, which does no more than accept the federal case law prevailing in 1971 (and today),[9] is hardly likely to have so dramatic an effect as the dissent fears. At least it will afford predictability and applicable precedent where neither previously existed. It marks the Court's return to a reasonable and principled construction of the ITCA. This Court cannot abandon clear indicia of legislative intent in order to pursue phantom fears of impending doom.

BISTLINE, J., concurs.

SHEPARD, Justice, dissenting.

Today the majority opinion takes this Court another gigantic step down a road leading to a morass of uncertainty and confusion, and ultimately to an upheaval of established law in the relationship between units of government and their peoples. Is a unit of government which provides services to be an ultimate insurer against all risk that may be encountered by a member of society? Today's case is cast in terms of a loss by fire and allegations that a municipal government failed to maintain an ade-

---

**8.** It should be noted that the state has enacted numerous other provisions to limit its liability. The ITCA limits the dollar amount of governmental liability arising out of individual accidents or occurrences. I.C. § 6–926. Governmental entities are liable "only for the pro rata share of the total damages awarded in favor of a claimant which is attributable to the negligent or otherwise wrongful acts or omissions of the governmental entity or its employees." I.C. § 6–903(a). Governmental entities are not liable for punitive damages. I.C. § 6–918. And governmental entities may be entitled to contribution, indemnification, and reimbursement of

legal fees where "the act or omission of the employee was outside the course and scope of his [or her] employment or included malice or criminal intent." I.C. § 6–903(d).

Also, in addition to the functions excepted from liability in I.C. § 6–904, the legislature has immunized certain governmental functions, such as deciding whether to parole or release prisoners. I.C. § 20–231.

**9.** One advantage of this approach is that it affords the wealth of federal case law from which to draw precedent.

quate water supply to guard against that danger of fire. Tomorrow's possible claims are endless and only limited by the ingenuity and imagination of counsel. Inadequate police protection against negligent or drunken drivers; negligent maintenance of traffic control signals; negligent police protection against the risk of burglars, robbers, murderers or rapists; negligent supervision of businesses such as insurance, real estate, pharmacies, financial marketing and markets, the practice of law and the practice of medicine, transportation and all of its ramifications—the horizons are unlimited for governmental liability to its citizens for almost any activity in which government may engage in efforts to better the living conditions of its people.

Since 1970 and the decision of *Smith v. State*, 93 Idaho 795, 473 P.2d 937 (1970), this Court has been engaged in an almost continual expansion of the liability of governmental entities under the aegis of responsibility for the "torts" of governmental servants and agents. Governmental liability has been imposed for damages resulting from negligent road maintenance and negligent road design. *See Leliefeld v. Johnson*, 104 Idaho 357, 659 P.2d 111 (1983); *McClure v. Nampa Highway District*, 102 Idaho 197, 628 P.2d 228 (1981). Liability was asserted but denied in the case of alleged negligent inspection of mines, *Dunbar v. United Steelworkers of America*, 100 Idaho 523, 602 P.2d 21, 1979), and alleged negligent fire protection, *Chandler Supply Company, Inc. v. City of Boise*, 104 Idaho 480, 660 P.2d 1323 (1983). Actions against governmental entities by reason of the actions of law enforcement officers have variously been upheld or denied. This Court recently has upheld a cause of action against the State resulting from the inadequate supervision of a parolee. *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986). The Court also recently has upheld a cause of action against a school district for the actions of a teacher in sexually molesting young children in school. The Court has pending, cases involving alleged negligent brand inspection by the State, negligent enforce-

ment of building codes by a municipality, and the alleged negligent maintenance of playground equipment in a municipal park. There would appear no end or limit to the liability potential of governmental entities.

I deem it necessary to pause in our journey down this road and reflect as to where we have been and where we are going.

The origins of sovereign immunity have been documented elsewhere. It is sufficient here to say that while tortious acts by a private individual or entity might result in liability, actions based on the same tortious conduct by the agents or servants of either the federal or a state government were not long ago barred by the concept of sovereign immunity. In the case of the federal government, for over 85 years there had been a steady encroachment by Congress on the doctrine of sovereign immunity which culminated in enactment of the Federal Tort Claims Act in 1946. Title IV of the Legislative Reorganization Act of 1946 (28 U.S.C.A. §§ 1346 to 2671 *et seq.*). Since that date the only significant amendatory language was added in 1974 in the aftermath of *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), to permit actions under the FTCA for a narrow range of intentional torts.

The states, either by court decision or statutory enactment, somewhat later came to the waiver of otherwise sovereign immunity. Indicative of the change of philosophy within the states is the language of Roger Traynor writing for the California court in *Muskopf v. Corning Hospital Dist.*, 55 Cal.2d 211, 71 Cal.Rptr. 89, 359 P.2d 457 (1961):

> The rule of governmental immunity for torts is an anachronism, without rational basis, and has existed only by the force of inertia. . . .

> None of the reasons for its continuance can withstand analysis. No one defends total governmental immunity. In fact, it does not exist. It has become riddled with exceptions, both legislative and judi-

cial and the exception operates so illogically as to cause serious inequality.

Only the vestigial remains of such government immunity have survived; its requiem has long been foreshadowed. For years the progress of erosion of governmental immunity has gone on unabated. The legislature has contributed mightily to that erosion. The courts by distinction and extention, have removed much of the force of the rule. Thus in holding that the doctrine of governmental immunity for torts for which its agents are liable has no place in our law we make no startling break with the past but merely take the final step that carries to its conclusion an established legislative and judicial trend.

Traynor, however, was not without qualification in taking that final step since he said:

Abrogation of governmental immunity does not mean that the state is liable for all harms that result from its activities. Both the state and individuals are free to engage in many activities that result in harm to others so long as such activities *are not tortious*.... Although it "is not a tort for government to govern" and basic policy decisions of government within constitutional limitations are therefore necessarily nontortious, it does not follow that the state is immune from liability for the torts of its agents. These considerations are relevant to the question in any given case the state through its agents has committed a tort.... Nor does our decision herein affect the subtle rules of immunity of government officials for acts within the scope of their authority.

Most other states, either judicially or legislatively, have followed that lead. Idaho, following the decision of *Smith v. State*, legislatively abolished sovereign immunity. Idaho, like most jurisdictions that have acted legislatively, did so in language substantially tracking that of the Federal Torts Claims Act. Thus, the problems of statutory interpretation which had been plaguing the federal courts, also came to puzzle

and confound the state courts. I hold to the view that when Congress enacted the FTCA it had no intent to create new causes of action, but rather intended only to remove the bar to liability when government agents or servants engaged in activity which would be delineated as tortious if the actor were a private individual.

As the Supreme Court said earlier in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950):

The Tort Claims Act was not an isolated and spontaneous flash of congressional generosity. It marks the culmination of a long effort to mitigate unjust consequences of sovereign immunity from suit.... The primary purpose of the Act was to extend a remedy to those who had been without; ... for the purpose, the Act goes on to prescribe the test of allowable claims, which is, "the United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." *It will be seen that this is not the creation of new causes of action* but acceptance of liability under circumstances that would bring private liability into existence.

Thus, I posit that under the FTCA one must examine the actions complained of by the government agent or servant to determine if that conduct was tortious; *i.e.,* was a dangerous product manufactured which damaged the plaintiff; was a fire negligently permitted on government premises which spread to and damaged the premises of a plaintiff; was a plaintiff invitee damaged through the negligent maintenance of government premises; was a plaintiff pedestrian damaged by the negligent operation of a government vehicle.

There are indeed a host of situations wherein the actions of government servants and employees are tortious and should result in governmental liability. As the dissent observed in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953):

We who would hold the government liable here cannot avoid consideration of

the basic criteria by which courts determine liability in the conditions of modern life. This is a day of synthetic living, when to an ever increasing extent our population is dependent upon mass producers for its food and drink, its cures and complexions, its apparel and gadgets. These no longer are as natural or simple products but complex ones whose composition and qualities are often secret. Such a dependent society must exact greater care than in more simple days and must require from manufacturers or producers increased integrity and caution as the only protection of its safety and well being. Purchasers cannot try out drugs to determine whether they kill or cure. Consumers cannot test the youngster's cowboy suit or the wife's sweater to see if they are apt to burst into fatal flames. Carriers, by land or sea, cannot be experimenting with the combustibility of goods in transit. Where experiment or research is necessary to determine the presence or the degree of danger, the product must not be tried out on the public, nor must the public be expected to possess the facilities or the technical knowledge to learn for itself of inherent but latent dangers. The claim that a hazard was not foreseen is not available to one who did not use foresight appropriate to his enterprise. Forward looking courts, slowly but steadily, have been adapting laws of negligence to these conditions.... but many acts of government officials deal only with the housekeeping side of the federal activities. The government, as land owner, as manufacturer, as shipper, as warehouseman, as ship owner, and operator, is carrying on activities indistinguishable from those performed by private persons. In this area, there is no good reason to stretch the legislative text to immunize the government or its officers from responsibility for their acts, if done without appropriate care for the safety of others. Many official decisions even in this area may involve a nice balancing of various considerations. But this is the same kind of balancing which citizens do

at their peril and we think it is not within the exception to the statute.

In my view the same theories can be ascribed to the intention of our legislature in enacting our state Tort Claims Act. There is nothing in the text of the Act itself, nor in any of its sparse legislative history, which should lead to a conclusion that the legislature intended to create new causes of action wherein government entities in Idaho should be held liable for the less than perfect performance of services it renders to its citizens. Most simply put, in the words of Jackson, J., in *Dalehite*, and reiterated by Traynor, it is not a tort for the government to govern.

As noted *supra*, the language of the Federal Tort Claims Act has unfortunately served as a model for state legislatures. It is argued, therefore, that the interpretation of the federal courts should be viewed as controlling in our interpretation of our state Act, and that it should be assumed that our legislature was aware of those interpretations of the federal Act and intended to incorporate them into our state Act. There is respectable authority for those assertions, and in the ordinary case I might agree. However, as will be demonstrated, to apply such "reasoning" in the instant case is absurd, if not ludicrous.

As noted above, the Supreme Court in *Feres* indicated that the Congress did not intend to create a new cause of action with the Federal Tort Claims Act, but merely intended to remove the bar of sovereign immunity to claims otherwise cognizable for the tortious acts of government agents and servants. *Dalehite* is the seminal case of interpretation of the Federal Tort Claims Act, and it has been most recently reaffirmed by the Supreme Court in *United States v. Varig Airlines*, 692 F.2d 1205 (9th Cir.1982), *rev.*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

In *Dalehite*, it was clear that agents and servants of the federal government had been guilty of culpable negligence and had committed tortious acts for which only the doctrine of sovereign immunity would have

precluded liability on the part of the government. The trial court had clearly found "negligence" and tortious behavior in that a product which was supposedly fertilizer, was in actuality a high explosive, was negligently produced, packaged, labeled, and shipped. Not surprisingly, when ships in Texas City were being loaded with the "fertilizer," fire broke out resulting in an explosion which killed 560 people and injured 3,000 more. The entire port area was essentially vaporized.

The decision of the Supreme Court was 4–3 with two justices not sitting. The Court seems to have assumed that the acts of the various governmental agencies were indeed tortious. As described by the dissent:

This was a man-made disaster; it was in no sense an "act of God." The fertilizer had been manufactured in government-owned plants at the government's order and to its specifications. It was being shipped at its direction as part of its program of foreign aid. The disaster was caused by forces set in motion by the government, completely controlled or controlable by it. Its causative factors were far beyond the knowledge or control of the victims; they were not only incapable of contributing to it, but could not even take shelter or flight from it. The fertilizer, ammonium nitrate had been long used as a component in explosives and was manufactured in plants formerly used for the manufacture of explosives for the Army and consultation was sent from "such experienced commercial producers of high explosives as the DuPonts and the Atlas and the Herculeus powder concerns."

Thus, the Court had no real need to analyze whether or not the behavior and acts were tortious. Rather, assuming that the acts were tortious the Court then went on to examine, albeit the acts were tortious, whether the government was nevertheless exempt from liability under the specific provisions of the FTCA. The majority held that the specific acts of negligence, "were all reasonably made at a planning rather than an operational level and involved considerations more or less important to the practicability of the government's fertilizer program." For example, as to the bagging temperature it was held, "[i]t would be possible to keep the product in the graining kettles for a longer period or to install cooling equipment. But both methods would result in greatly increased production costs and/or greatly reduced production." Such seems to be a bizarre approach since certainly such excuses would not be heard or tolerated from private producers. As noted by the dissent:

If decisions are being made at cabinet levels as to the temperature of bagging the explosive fertilizers, whether paper is suitable for bagging hot fertilizer, and how bags should be labeled, perhaps an increased sense of caution and responsibility even at that height would be wholesome.... The government's negligence here was *not in policy decisions of a regulatory or governmental nature,* but involved actions akin to those of a private manufacturer, contractor, or shipper. (emphasis supplied)

In my view the majority decision of the Court in *Dalehite* was blatantly erroneous and was only further compounded when the Court undertook to attempt its definition of the discretionary act exemption in the FTCA as being the difference between a planning and operational dichotomy. In my judgment the decision of the Court was bottomed on a reluctance to face up to the enormity of the disaster and the enormity of governmental liability for its acts.

A short two years later the case of *Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) came before the Court. The circuit court had held that the claim for a barge running aground because of an inoperative lighthouse was governed by the *Feres* and *Dalehite* decisions, and hence did not fall within the purview of the Federal Tort Claims Act. The Court splitting 4–4, the decision of the court of appeals was affirmed. On rehearing the Court, with its full compliment, split 5–4 in holding liabili-

ty. The government had conceded that the discretionary function provision of the FTCA was not involved, but rather argued that since private persons did not and could not perform the activities at issue that there was no liability. The Court quickly hurdled the question of whether the acts of the government's servants were "tortious" by setting up and then destroying a straw man, *i.e.*, the governmental-proprietary distinction in the field of municipalities. The Court merely backhanded *Dalehite* and *Feres* saying, "neither case is applicable" and "the differences between this case and *Dalehite* need not be labored. The governing factors in *Dalehite* sufficiently emerge from the opinion in that case." The opinion of the Court is perfunctory and it is significant that not a single scrap of authority was cited indicating that when a governmental entity performed services for its people, a good samaritan type of liability was to be imposed.

The dissenters pointed out that there could hardly be any parallel private liability since lighthouse keeping was prohibited to anyone but government. The dissenters stated: "In dealing with this enlarged concept of federal liability for torts, wisdom should dictate a cautious approach along the lines of *Feres* and *Dalehite*." In 1957 the Court had for consideration *Rayonier v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354, in which the Ninth Circuit had denied liability on the basis of *Dalehite* and *Feres* for a claim involving government agents failing to act with due care in the starting of a fire on federal forest lands which spread to private lands. In *Rayonier*, the Court only considered whether the government should be liable for the negligence of its agents acting in the "uniquely governmental" capacity of public fireman. The Court held that it was ruling only on that portion of the FTCA requiring government liability only if a private individual would be liable under like circumstances. The Court stated:

> In view of the circumstances, we think it proper to vacate both judgments in their entirety so that the district court may consider the complaints anew, in their

present form or as they may be amended wholly free to determine their sufficiency on the basis of whether the allegations and any supporting material offered to explain or clarify them would be sufficient to impose liability on a private person under the laws of the state of Washington.

In my view the circumstances demonstrated the commission of a tortious act for which liability would be held absent the interposition of sovereign immunity.

The Court did not again speak significantly on the FTCA and governmental liability thereunder until 1984. During that time lapse the lower federal courts were equally divergent in their understanding of the FTCA, the discretionary act exemption, and the private parallel analyses. It is my view that *Dalehite* was wrongly decided and contained much obfuscation and confusion. It is further my view that such confusion continued in decisions of the lower federal courts. For example, *compare Smith v. United States*, 375 F.2d 243 (5th Cir.) *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967) (liability was denied for the failure to protect a federal juror), and *Martin v. United States*, 546 F.2d 1355 (9th Cir.1976) (denying liability for the death of a camper by a grizzly bear attack in Yellowstone National Park), with *Downs v. United States*, 522 F.2d 990 (6th Cir. 1975) (liability was allowed for the actions of FBI agents during an aircraft hijacking when the hijacker killed two occupants of the plane and then himself when the FBI prevented the plane from leaving the ground).

In *Griffin v. United States*, 500 F.2d 1059 (3rd Cir.1974) (court affirmed liability to a woman who became a quadraplegic by reason of ingesting live virus polio vaccine. The decision to release the vaccine, albeit it exceeded the permissible levels of neurovirulence, was made on the theory of "biological variation.") *Griffin* should be compared with *First National Bank of Albuquerque v. United States*, 552 F.2d 370 (10th Cir.) *cert. denied*, 434 U.S. 835, 98

S.Ct. 122, 54 L.Ed.2d 96 (1977), wherein plaintiff had relied heavily upon *Griffin. First National Bank* involved the alleged inadequate testing of a fungicide which later found its way into the food chain, with four children of one family eating pork which had been fed grain treated with mercury fungicide.

In *Jayvee Brand, Inc. v. United States*, 721 F.2d 385 (D.C.Cir.1983), manufacturers of children's garments had been required by the Secretary of Commerce to treat the garments with a flame-retardant compound which was later determined by the government to be a carcinogen. The manufacturer was required to repurchase the treated clothing. Governmental liability was denied on the basis that the private parallel was lacking, and stated: "Furthermore, as the Supreme Court has observed, the entire thrust of the FTCA is in a different direction from that appellants would have us give it: 'uppermost in the collective mind in Congress were the ordinary common law torts.'" The concurring opinion stated:

> Where the wrongful conduct falls within one of the "ordinary common law torts" (e.g. negligent auto accidents) that motivated the passage of the FTCA that showing is amply made by the legislative history of the act. But where the tort theory is novel and the legislative history is silent, courts have looked beyond the act itself for evidence of congressional intent, considering among other things how extending tort liability in a particular case would fit into the entire statutory scheme of remedies against the government to make a workable consistent and equitable whole.... When the evidence strongly suggests no waiver was intended, courts have not hesitated to so find, notwithstanding the inability to fit the case within any express exception.

In *Warren v. District of Columbia*, 444 A.2d 1 (D.C.Ct.App.1981), a claim was made for the actions of police in failing to respond to emergency calls, and during the next 14 hours the women were held captive, raped, beaten, robbed, and forced to submit to sexual demands. The court denied liability holding:

> Plaintiffs in this action would have the court and a jury of 12 additional community representatives join in the responsibility of judging the adequacy of a public employee's performance in office.... Should a court also be empowered to evaluate contact, in the context of a tort action, the handling of a major fire and determine whether the hoses were properly placed and the firemen correctly allocated. Might a court also properly entertain a tort claim over a school teacher's ability to teach seventh grade English or over a postman's failure to deliver promptly an important piece of mail.... An enormous amount of public time and money would be consumed in litigation of private claims rather than in bettering the inadequate service which draws the complaints.... Although recognizing the obligation of public employees to perform their duties fully and adequately, the law properly does not permit that obligation to be enforced in a private suit for money damages.

This Court is thus asked to rely upon interpretations of the federal courts since our legislators must have done so in the enactment of the state Tort Claims Act. We are faced with three decisions of the United States Court, *Dalehite*, *Indian Towing*, and *Rayonier*. In my view the Court in *Dalehite* grievously erred. A rather obvious tortious act had been committed by governmental agents or servants for which recovery should have been allowed. The Court, for whatever reason, wallowed in the discussion of the discretionary act exemption and its planning-operational dichotomy in its effort to find a rationale for denial of liability. In *Indian Towing* the Court neglected to examine the first step of analysis, *i.e.*, whether the acts complained of constituted a tort, and although its result involved an overruling of *Dalehite*, it refused to do so. *Rayonier* also involved the commission of a tortious act, *i.e.*, allowing a negligently started and controlled fire to damage another's premis-

753

es. Fortunately the Court reached a correct result.

In my mind the decisions and rationales of the lower federal courts reflect the confusion resulting from the trilogy of the Supreme Court cases. It is against this crazy-quilt backdrop that we are asked to assume that our legislators could draw intelligence and reason in the formulation of our state Tort Claims Act. I view such a suggestion to be ludicrous.

I view the decisions of the various state jurisdictions to be a further indication that they, like us, are groping, grasping, and desperately attempting to make sense of nonsense.

After many years of silence the Supreme Court again spoke as to the interpretation of the FTCA and which of its previous decisions were surviving. Incredibly the opinion was issued for a unanimous Court. The Court stated that while it was argued that *Dalehite* had been overruled by *Indian Towing Company*, "while the Court's reading of the act admittedly has not followed a straight line, we do not accept the supposition that *Dalehite* no longer represents a valid interpretation of the discretionary function exception." The Court, as in other cases, did not question whether the circumstances disclosed a "tortious" act, but rather evidently assumed the existence of such an act and led to a consideration whether nevertheless liability of the federal government was barred because of the discretionary function exception.

In *Varig* it was claimed that a federal agency had been negligent in certificating aircraft for air worthiness which had led to crashes of aircraft. The Ninth Circuit had held that the "good samaritan rule" formed a basis for the claim under the FTCA and that the discretionary function exception to the Act did not bar the claim.

The Court refused to depart from the *Dalehite* decision stating: "While the Court's reading of the Act admittedly has not followed a straight line, we do not accept the supposition that *Dalehite* no longer represents a valid interpretation of the discretionary function exception." The

Court seems to have bottomed its decision on the circumstance that the activities of the government were "regulatory" in nature:

Whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the government acting in its role as a regulator of the conduct of private individuals....

In rendering the United States amenable to some suits in tort, Congress could not have intended to impose liability for the regulatory enforcement activities of the FAA challenged in this case. The FAA has a statutory duty to *promote* safety in air transportation, not to insure it.

It is difficult, of course, if not impossible, to fathom a distinction in the difference in the regulation and promotion of safety of barge traffic on the Mississippi River from the regulation and promotion of safety in aircraft travel. However, the Court did not deal with that distinction. It is also difficult to fathom the Court's rejection of the application of the *Indian Towing* good samaritan doctrine to the actions of the government in *Varig*. I, and I am sure many members of the public, feel more secure and place confidence in commercial airline travel in the knowledge that the government has a program of certificating aircraft as air worthy. In my judgment the decision in *Varig* cannot be equated with *Indian Towing* nor *Eastern Airlines, Inc. v. Union Trust Company*, 221 F.2d 62 (D.C.Cir.1955), *aff'd*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed.796 (1955).

It is no vice to feel sympathy and compassion for those who have suffered damage by reason of the failure of a government entity to function perfectly. However, in my view it is a distortion of legal reasoning to classify such failure as a "tort" solely for the purpose of permitting recovery. In plain words, the Court has created a cause of action against government entities unknown at the common law, and in my judgment not intended by either our legislature or the Congress.

The creation of such a cause of action places courts in the position of passing judgment on the performance of other branches of government. I would ask by what standards we are to judge the actions of government in the furnishing of services to its people. Do we ask if that entity has acted as a reasonable and prudent government? If so, to what do we compare? Are we to consider a relatively affluent government entity, an average government entity, or a money-poor entity? Will that standard vary depending upon the willingness of a citizenry to pass a bond issue, the unwillingness of a commission, body, or legislature to appropriate funds or levy additional taxes.

I deem it clear that neither the Congress nor our state legislature, in their enactments of their respective tort claim acts, intended to create a new cause of action unknown to the common law. As stated in the "Idaho Tort Claims Act," I.C. § 6–903: "Nothing in this Act shall enlarge or otherwise adversely effect the liability of an employee or a governmental entity." Hence, I suggest that any analysis of a claim under the Tort Claims Act should involve a two-step procedure. First, the circumstances must exhibit the commission of a "tortious" act by a governmental servant or employee. If an act is to be held "tortious" it must involve the breach of a duty owed the victim by the actor, the consequences must have been reasonably foreseeable by the actor, and the act must have been the proximate cause of the damages without intervening causation. It is only if that first requirement is satisfied that it is necessary to move to the second step, i.e., although the act was "tortious" do provisions of the Tort Claims Act nevertheless continue to shelter the government unit from liability—was the "tortious" act intentional such as arising out of assault and battery, liable, slander, etc.—although the act was tortious did it involve the exercise of discretion?

Therein I believe lies the difficulty with many of the decisions. I assert that too many courts have entered into the morass of attempting to determine whether there has been an exercise of judgment, at whatever level, to bring the circumstances within the liability bar of the discretionary function exception without first determining if the act complained of was "tortious."

I now turn to the concept of the government being considered a good samaritan for the purpose of establishing a "tortious" act if it renders less than perfect service in any of the plethora of activities in which it engages in its efforts to benefit its citizens. Government at various levels touches our lives literally from the cradle to the grave. It prescribes testing of, and procedures to be used upon, newborn infants. It regulates the practice of organ transplants, embalming, and burial. It regulates the food we eat; the drugs and pharmaceuticals which we use; the clothing we wear; the vehicles we use for transport; and the media upon or in which we are transported; it regulates the construction of the structures where we live or work; it regulates our wages and the length of time we may labor; it regulates the institutions and markets in which we may invest our monies. It touches every aspect of our lives including the air we breathe.

In history's drive toward the accomplishment of a social welfare state, federal, state and local governments undertake programs to protect people against almost every conceivable risk of harm or evil in almost every aspect of their lives. While in days past those programs were relatively minimal, now almost every human activity is touched by government protectionism. Some critics assert that the individual is being stultified and society is being overly regulated and/or protected. Nevertheless, such governmental regulation and protectionism appears to be our public policy, and I would doubt that there will be any reversal of that trend. I also suggest, however, that if less than perfect performance of such regulatory protectionism is to be the basis of governmental liability, then the costs of such programs will become even more astronomical. When such costs cannot be afforded, undoubtedly programs will

be terminated, a result which I would consider contrary to public policy.

I suggest further that the literal extension of the so-called good samaritan rule to establish liability in the less than perfect rendition of governmental services, raises the spector of other dangers outside the area of government. Assume that a public benefit is conferred by the public dissemination of information in our print and broadcast media. I would take judicial notice that the media publishes information of weather prediction, road reports, financial markets, livestock prices, currency fluctuations, and other beneficial information. If such information is negligently collected, transmitted, collated, printed, or broadcast, and an individual suffers damage thereby, do such circumstances constitute a "tortious" act for which liability may result? I would hold that public policy is to the contrary, since if such liability were to be established, the logical action to avoid future liability would be to discontinue the dissemination of such news. In my view the discontinuance of such information would be contrary to public policy. If we look to legislative intent, how do we view legislative intent as demonstrated in I.C. § 5-330, abolishing, at least in part, traditional good samaritan liability.

As stated at the outset of this overly long dissent, I believe this Court should exercise caution before taking this next gigantic step down the road of liability for the less than perfect acts of government, which I hold is the establishment of a new cause of action in "tort" unknown to the common law, and not contemplated by the legislative bodies enacting the "tort" claims act. In my mind, if Erle Stanley Gardner were chronicling these events, he would entitle his writing "The Case of the Tortured Tort."

I assert that this Court has in past decisions enacted massive changes in policy concerning the relationship between entities of government and their citizens. Today the change is amplified and expanded into unlimited fields of government activity. The majority asserts that the law of "tort" requires the result. I disagree. Such "tort" liability was unknown in the common law and I would hold that the legislature did not intend to create such a new and novel cause of action.

BAKES, Justice, dissenting.

I dissent for the reasons set out in my dissenting opinion in *Sterling v. Board of Corrections*, 111 Idaho 211, 723 P.2d 755 (1986).