745 P.2d 1055

**Rose M. WERNER, as Guardian Ad Litem for Arthur Werner, and Rose M. Werner, individually, Plaintiffs–Appellants,**

v.

**AMERICAN–EDWARDS LABORATORIES, INC., A DIVISION OF AMERICAN HOSPITAL SUPPLY CORPORATION, a foreign corporation, Defendant,**

and

**Duane A. Daugharty, M.D.; and Eugene M. Trout, M.D., Defendants–Respondents.**

No. 16518.

Supreme Court of Idaho.

Oct. 29, 1987.

Howard & Owens, Coeur d'Alene, Bruce R. Owens argued, for plaintiffs-appellants.

Paine, Hamblen, Coffin, Brooke & Miller, Coeur d'Alene, Eugene L. Miller, for defendant-respondent Daugherty.

Quane, Smith, Howard & Hull, Boise, Kathryn A. Sticklen, for defendant-respondent Trout.

HUNTLEY, Justice.

Plaintiff Rose M. Werner, individually and as guardian ad litem for Arthur Werner, appeals the trial court's grant of summary judgment to defendants Duane A. Daugharty, M.D. and Eugene M. Trout, M.D., on grounds that Werner's claims for professional malpractice were barred by the statute of limitations. To explain the complex and uncertain factual setting, a protracted statement of the facts is necessary.

In 1964, Arthur Werner, then forty-six years old, had his diseased aortic valve replaced with a Starr–Edwards aortic heart valve. At the time, Werner was under the care of Dr. Daugharty, a specialist in internal medicine. In April, 1965, Werner suffered a minor stroke caused by embolization from the prosthetic heart valve. Thereafter, Dr. Daugharty prescribed Coumadin, an anticoagulant, for Werner. Dr. Daugharty further suggested that Werner have the heart valve replaced with an aortic homograft, but Arthur Werner declined further surgery.

Arthur Werner continued to take Coumadin as an anticoagulant until November 1978. At that time, Dr. Daugharty discontinued the prescription of Coumadin because Werner had a high prothrombin time (since Werner occasionally failed to take the medication prescribed) and had a history of repeated trauma and injury. Dr. Daugharty placed Werner on a prescription of aspirin and Persantine, the combination of which served as an anticoagulant. Arthur Werner last saw Dr. Daugharty on August 8, 1981.

Later that month, Arthur Werner began seeing Dr. Trout as his primary physician. The medical records show the notation "d/c Persantine." In medical parlance, "d/c" generally is shorthand for the word "discontinue." In his deposition, Dr. Trout acknowledged the existence of the notation and that the notation "looks like a recommendation," but testified that he could not re-

member ordering the discontinuation of Persantine. (The record is unclear as to when the "d/c Persantine" notation, if valid, was made). On December 1, 1981, Arthur Werner came to Dr. Trout complaining of chest pains. Suspecting heart problems of some sort, Dr. Trout ordered chest x-rays which were generally inconclusive. According to the medical records, Dr. Trout wrote his diagnosis as being hypertension, but also testified that he thought the incident might be due to heart problems. The following excerpt from Dr. Trout's deposition indicates the inconclusive state of facts surrounding the December 1, 1981 visit and the amount and kind of medication Werner was then receiving.

Q. Okay, so 12–01–81, he comes back in. And apparently, at that point, you made the reference there, "Persantine didn't help."

A. Yes.

Q. What was that referring to?

A. Well, he was still on the Persantine. That's why I—the only thing I can gather from this—that I didn't—if I did recommend to discontinue it, he probably didn't. What also might have happened is that he did discontinue it. But when he had these symptoms, he decided, oops. Persantine's for my heart. I'd better take some. So he took some, and it didn't help. That's probably what happened.

Q. And so at that point, you prescribed 25 milligrams?

A. Yes. I—at that point, if—my memory being what it is—I probably told him to start taking it again.

There were also notations on the medical records where Dr. Trout recommended doubling Werner's Persantine prescription to 50 milligrams per day, and some mention that the prescribed dosage may, at some time, have been as high as 200 milligrams per day.

As is apparent, the deposition testimony of Dr. Trout provides a confusing explanation concerning Werner's treatment subsequent to August 1981. Indeed, Dr. Trout himself testified to being confused as to the facts.

Q. So basically, we have then—apparently, was that an earlier recommendation or writing; and then subsequently, you changed that with the 50 milligrams?

MR. QUANE: I don't think he said that.

THE WITNESS: Well, see at the top where it says Persantine, 25 milligrams?

Q. (By Mr. Owens) Yes.

A. That's what he was taking when he came to me. And at the bottom is the advice to double it. This is where my confusion is.

Q. Uh-huh?

A. He was taking—he—when I said stop it, he may have stopped. He may have started it again. I don't know.

Q. Okay. Or you may just have been referring to the fact that that was your understanding of what he had been taking, prior to the time you told him to discontinue it—the 25 milligrams?

A. Yes.

Lending further confusion to the record, contrary to Dr. Trout's written record that he diagnosed hypertension as a cause of the chest pains on December 1, 1981, he later stated in his deposition that he did not reach any diagnosis, but had "questions in my mind—did he have some heart failure?". Subsequent medical records dated December 10, 1981, indicate that Werner had not experienced chest pains "since stopping Persantine."

The record as a whole, despite detailing numerous conflicting courses of treatment arising out of the December 1, 1981, incident, does not explain the cause of that incident. The record alludes only to either hypertension or heart failure and at no place suggests the symptoms of that date were related to embolism originating from the situs of the heart valve. Neither does the record relate the symptomology on December 1st, 1981 to the prescription or non-prescription of drugs.

1. **5–219. Actions against officers, for penalties, on bonds, and for professional malpractice or for personal injuries.**—Within two (2) years:

....

Shortly after the December visits with Dr. Trout, Werner suffered a massive stroke on March 31, 1982. The Werners filed claim on March 28, 1984, with Rose Werner appointed as guardian ad litem for Arthur Werner, November 10, 1985. On November 29, 1985, Arthur Werner died.

The trial court granted summary judgment on grounds that plaintiff had failed to file the cause of action within the applicable statute of limitations, I.C. § 5–219(4), which provides that actions for personal injury and professional malpractice must be filed within two years of the accrual of a cause of action. I.C. § 5–219(4) provides in pertinent part: "The cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of...."

Construing the above language, the trial court held that Werners' cause of action accrued when *some* damage occurred—in this case, when a "process of continued embolization" began to occur once Werner was removed from Coumadin in 1978, or, the date of Werner's last visit to either Dr. Daugharty or Dr. Trout, ruling that, in either event, the cause of action was not timely. The trial court noted that plaintiffs, by their own allegations in their second amended complaint stated that any damage occurred due to an alleged failure to provide proper treatment. Any such inadequate treatment, or failure to provide treatment, the trial court ruled, had "occurred" by the time of Werner's last visit to the doctors. We are called upon to decide whether the trial court appropriately granted summary judgment.

We note at the outset that, on review, this Court must view the facts in a light most favorable to the nonmoving party when reviewing the grant of summary judgment. *Jones v. City of St. Maries*, 111 Idaho 733, 727 P.2d 1161 (1986).

Additionally, our analysis is guided by I.C. § 5–219(4).[1]

(4) An action to recover damages for professional malpractice, or for an injury to the person, or for the death of one caused by the wrongful act or neglect of another, including any such action arising from breach of an implied warranty or implied covenant; provided,

Dr. Daugharty argues that any "occurrence, act or omission" caused by him must necessarily have occurred within two years of his last contact with Arthur Werner. As already noted, Dr. Daugharty last saw Arthur Werner August 8, 1981; and the Werners filed claim more than two years later, on March 30, 1984. Alternatively, Dr. Daugharty argues that the statute of limitations should have begun to run as of the time he removed Arthur Werner from Coumadin in November 1978. At that time, Dr. Daugharty argues, increased embolization from the heart valve began, resulting in "damage" to Arthur Werner, which "damage" *commenced the running of* the statute of limitations.

Similarly, Dr. Trout also urges that any "damage" caused by him must have occurred prior to his last visit with Arthur Werner in December 1981. (Werner continued to have his blood pressure monitored by Dr. Trout's nurses until February, 1982.) Dr. Trout urges that the Werners essentially allege that Dr. Trout negligently failed to recognize Arthur Werner's continued need for anticoagulation treatment. This "occurrence" necessarily took place prior to the last date on which Dr. Trout saw Werner—which was more than two years from the date suit was filed.

We begin our analysis of the operation of I.C. § 5–219(4) in the instant fact situation by stating that Idaho has explicitly rejected a "discovery rule" for the tolling of statutes of limitations in malpractice cases except in very narrow circumstances.

[T]he legislature in 1971, amended I.C. § 5–219(4) to provide that the discovery rule would *not* apply to malpractice cases, but at the same time incorporated therein to expressly define exceptions for foreign objects left in a patient's body and for fraudulent concealment of negligence. *Streib v. Veigel,* 109 Idaho 174, 175, 706 P.2d 63, 64 (1985).

(See also, *Wing v. Martin,* 107 Idaho 267, 270, 688 P.2d 1172, 1175 (1984)). Neither instance allowing for delayed *running of the statute* until discovery applies in the instant case.

We are concerned, then, with which acts or events, in this case, constitute the "occurrence, act or omission." Plaintiffs cite several cases as particularly instructive. In *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984), this Court held the statute of limitations in a wrongful birth action commenced on the date of birth, not at the time of the doctor's negligent act. In *Chapman v. Cardiac Pacemakers, Inc.,* 105 Idaho 785, 673 P.2d 385 (1983), we held that a cause of action for wrongful death accrues upon death and not the installation of a defective pacemaker.

■ However, a simplistic recitation of the holdings in those cases will not suffice to address the instant situation. In both *Blake* and *Chapman,* the very injuries for which redress was sought in the complaints

---

however, when the action is for damages arising out of the placement and inadvertent, accidental or unintentional leaving of any foreign object in the body of any person by reason of the professional malpractice of any hospital, physician or other person or institution practicing any of the healing arts or when the fact of damage has, for the purpose of escaping responsibility therefor, been fraudulently and knowingly concealed from the injured party by an alleged wrongdoer standing at the time of the wrongful act, neglect or breach in a professional or commercial relationship with the injured party, the same shall be deemed to accrue when the injured party knows or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of; but in all other actions, whether arising from professional malpractice or otherwise, *the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of,* and the limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom or any continuing professional or commercial relationship between the injured party and the alleged wrongdoer, and, provided further, that an action within the foregoing foreign object or fraudulent concealment exceptions must be commenced within one (1) year following the date of accrual as aforesaid or two (2) years following the occurrence, act or omission complained of, whichever is later. The term "professional malpractice" as used herein refers to wrongful acts or omissions in the performance of professional services by any person, firm, association, entity or corporation licensed to perform such services under the law of the state of Idaho. This subsection shall not affect the application of 5–243, Idaho Code, except as to actions arising from professional malpractice. Neither shall this subsection be deemed or construed to amend, or repeal section 5–241, Idaho Code. (Emphasis added).

did not occur until the wrongful birth or wrongful death resulting from the alleged negligent acts. Defense counsel argues that the chest pains Arthur Werner felt on December 1st, 1981 could have occurred due to problems with the prosthetic heart valve, possibly caused by inadequate anticoagulant treatment. If such were the case, this Court would view December 1, 1981, as the date on which the statute of limitations began running on the Werners' claim, it being an "occurrence" of some damage resulting from the defendants' alleged negligence. However, the convoluted and uncertain testimony and general undeveloped state of the record regarding the December 1, 1981 symptomology does not support such a finding. Indeed, the trial court did not so find and instead ruled that the statute of limitations began to run in 1978, when Werner was removed from Coumadin therapy, resulting in an increased process of continued embolization from the heart valve, which process, the trial court held, was an "occurrence" of damage sufficient to commence the running of the statute of limitations.

We expressly reject the trial court's analysis. For the trial court, or any court, to rule that damage has occurred as of the date on which a latent, continuing process is suspected to have begun—which might eventually result in damage (here, a stroke) is pure medical speculation. It ignores the tenuous nature of predicting medical results and is particularly inappropriate speculation when viewed in the context of a motion for summary judgment.

This Court has held both that "a cause of action does not accrue until the fact of injury becomes objectively ascertainable," and we will not require a plaintiff to maintain suit absent such "objectively ascertainable" damage. *Davis v. Moran*, 112 Idaho 703, 735 P.2d 1014, 1020 (1987).

This is consistent with this Court's decision of seventy years ago in *Rogers v. Oregon-Washington R. & Nav. Co.*, 28 Idaho 609, 620, 156 P. 98, 101 (1916).

[Plaintiff] in this action having suffered no damages prior to 1913, would not be in a position to maintain an action at any time before that date. His land was not taken.... He had no reason to believe that the obstruction placed in the stream by appellant adjacent to his land was of such a character as to ultimately cause damage to his premises.... *He was in no position to prove damages until they actually occurred.* (Emphasis added).

■ Indeed, the latent circumstance of increased probability of embolization, resulting in possible future adverse medical consequences seems far too attenuated an "occurrence" to give rise to a viable cause of action such as would activate a statute of limitations. Indeed, this seems analogous to the hypothetical scenario previously described by this Court in *Streib, supra.*

If A sets a spring gun and two years elapse before B, a police officer, opens the door, has B's cause of action been barred by the statute of limitations? Or is the tort continuing in nature until B is damaged? Clearly the latter result should obtain.

109 Idaho at 179, 706 P.2d at 68. In the instant case, the Werners would either have had a viable cause of action at the time of the stroke of March 31, 1982, in which instance their cause of action was timely filed; or, on December 1, 1981, *if* the occurrences of that day were *shown* to have been damage caused by embolization from the heart valve due to defendants' alleged inadequate treatment of Werner, in which case plaintiffs would have failed to meet the statute of limitations.

■ The record has not been adequately developed to enable resolution of that issue. As we stated in *Davis v. Moran, supra:* "Because the evidentiary record in this case is either silent or conflicting as to when any such damage occurred, the trial court erred in granting summary judgment based upon the running of the statute of limitations in I.C. § 5–219(4)." *Davis v. Moran, supra,* 735 P.2d at 1020.

Additionally, we note that there has been no showing in the record of any cause-effect relationship between the alleged negligence of Dr. Daugharty in discontinuing

Coumadin and Arthur Werner's subsequent stroke. However, we cannot address this issue on appeal, as respondents did not submit the issue either before the trial court or on appeal, and the Werners have not had the opportunity to address such grounds for summary judgment through affidavits. I.R.C.P. 56.

Accordingly, we reverse and remand for further proceedings consistent herewith, and note that such a determination appears, at least on the present record, to be a question of fact for the jury. Costs to appellant, no attorney fees on appeal.

DONALDSON * and BISTLINE, JJ., concur.

BAKES, J., concurs in part, dissents in part.

SHEPARD, C.J., dissents.

BAKES, Justice, concurring in part and dissenting in part.

I concur in the result reached by the Court's decision in overruling the summary judgment against Dr. Trout. The record is, at this stage, too "uncertain," as the Court's opinion notes, and accordingly summary judgment against plaintiff's claim against Dr. Trout should not have been granted on that record.

However, plaintiff's claim against Dr. Daugharty is another matter. The Court's opinion hardly acknowledges that these are two separate factual claims against two different doctors, which must be analyzed separately. The facts of plaintiff's claim against Dr. Daugharty are not "uncertain." They are adequately set out in the majority opinion, which discloses that in 1964 the plaintiff, then 46 years old, had his diseased aortic valve replaced with a Starr–Edwards aortic heart valve. At the time, Werner was under the care of Dr. Daugharty, a specialist in internal medicine. In April, 1965, Werner suffered a minor stroke caused by embolization from the prosthetic heart valve. Thereafter, Dr. Daugharty prescribed coumadin, an anticoagulant for Werner. Dr. Daugharty fur-

ther suggested that Werner have the heart valve replaced with an aortic homograft, but Werner declined further surgery. Werner continued to take coumadin as an anticoagulant for 13 years. In November of 1978 Dr. Dautharty discontinued the prescription of coumadin because Werner had a high prothrombin time, apparently caused both because Werner occasionally failed to take the medication as prescribed, and because he had a history of repeated trauma and injury which implicated excessive bleeding. Dr. Daugharty placed Werner on a prescription of aspirin and persantine, which also served as an anticoagulant. Werner last saw Dr. Daugharty on August 8, 1981, after which he changed physicians.

That same month Werner engaged Dr. Trout as his primary physician. Dr. Trout's medical records show that he changed Werner's medication by discontinuing the persantine, although Werner may have continued to take the drug on occasion. On December 1, 1981, Werner was examined by Dr. Trout because of complaints of chest pains. After an extensive examination, he reinstituted the persantine medication, in varying strengths.

On March 31, 1982, some eight months after changing doctors, Werner suffered a massive stroke, which plaintiff alleges was a result of improper medication. Plaintiff's claim was filed nearly two years later on March 28, 1984. As to Dr. Daugharty, the claim was filed nearly two years and seven months after plaintiff left the care of Dr. Daugharty, and began treatment with Dr. Trout. Plaintiff's claim against Dr. Daugharty alleged that Dr. Daugharty was negligent in removing Werner from the medication coumadin in November, 1978, some five and one-half years prior to the filing of the plaintiff's complaint.

On those facts the trial court did not err in concluding as a matter of law that the statute of limitations, I.C. § 5–219(4), had run against Dr. Daugharty. *Holmes v. Iwasa*, 104 Idaho 179, 657 P.2d 476 (1983). I would affirm the trial court's grant of summary judgment against plaintiff's claim against him.

* DONALDSON, J., sat and participated fully in the decision and opinion prior to his death.

440

SHEPARD, Chief Justice, dissenting.

For the following reasons I cannot agree with the majority opinion.

The specific issue posed in this case is, at what point in time does a cause of action accrue for medical malpractice, such that the statute of limitations begins to run under the provisions of I.C. § 5–219(4).

In *Streib v. Veigel*, 109 Idaho 174, 175–76, 706 P.2d 63, 64–65 (1985), this Court stated:

> The majority of the decisions of this Court involving statute of limitations defenses have concerned medical malpractice. In 1964, in construing the statute of limitations then effective for malpractice cases, this Court adopted the "discovery rule," to the effect that a cause of action for medical malpractice did not accrue until the patient learned, or in the exercise of reasonable care and diligence should have learned, of the damages resulting from the doctor's negligence. *See Billings v. Sisters of Mercy of Idaho*, 86 Idaho 485, 498, 389 P.2d 224, 232 (1964). *Billings* treated only the problem of foreign objects left in the patient's body, but that rule was extended to cover misdiagnosis cases in *Renner v. Edwards*, 93 Idaho 836, 475 P.2d 530 (1970). Apparently in response to *Renner*, the legislature, in 1971, amended I.C. § 5–219(4) to provide that the discovery rule would *not* apply to malpractice cases, but at the same time incorporated therein two expressly-defined exceptions for foreign objects left in a patient's body and for fraudulent concealment of negligence. The statute presently limits the time for filing suit for professional malpractice to two years, as follows:
>
> **5–219. Actions against officers, for penalties, on bonds, and for professional malpractice or for personal injuries.** —Within two (2) years:
>
> . . . .
>
> 4. An action to recover damages for professional malpractice, or for an injury to the person, or for the death of one caused by the wrongful act or neglect of another, including any such action arising from breach of an implied warranty or implied covenant; provided, however, when the action is for damages arising out of the placement and inadvertent, accidental or unintentional leaving of any foreign object in the body of any person by reason of the professional malpractice of any hospital, physician or other person or institution practicing any of the healing arts or when the fact of damage has, for the purpose of escaping responsibility therefor, been fraudulently and knowingly concealed from the injured party by an alleged wrongdoer standing at the time of the wrongful act, neglect or breach in a professional or commercial relationship with the injured party, the same shall be deemed to accrue when the injured party knows or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of; but in all other actions, whether arising from professional malpractice or otherwise, *the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of, and the limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom or any continuing professional or commercial relationship* between the injured party and the alleged wrongdoer, and, provided further, that an action within the foregoing foreign object or fraudulent concealment exceptions must be commenced within one (1) year following the date of accrual as aforesaid or two (2) years following the occurrence, act or omission complained of, whichever is later. The term "professional malpractice" as used herein refers to wrongful acts or omissions in the performance of professional services by any person, firm, association, entity or corporation licensed to perform such services under the law of the state of Idaho. (Original emphasis.)

In *Wing v. Martin*, 107 Idaho 267, 270–71, 688 P.2d 1172, 1175–76 (1984), this Court stated:

> Under I.C. § 5–219, a cause of action accrues at the time of the wrongdoing, rather than at the time of discovery of

the wrongful act. *Owyhee County v. Rife*, 100 Idaho 91, 593 P.2d 995 (1979); *Martin v. Clements*, 98 Idaho 906, 575 P.2d 885 (1978). See also *Twin Falls Clinic & Hospital Bldg. v. Hamill*, 103 Idaho 19, 644 P.2d 341 (1982).

In the instant case, Dr. Daugharty took Mr. Werner off of coumadin and substituted aspirin and persantine on November 27, 1978. From the record it appears that Dr. Daugharty did not see, treat or advise Mr. Werner after August 5, 1981. Thus, the complaint, filed March 30, 1984, was not filed within the two year statute of limitations. Suit was filed five years and four months after Dr. Daugharty had recommended discontinuance of coumadin and two years and eight months after Dr. Daugharty had last seen and treated Mr. Werner.

It is also apparent that the complaint was not timely filed against Dr. Trout. Mr. Werner commenced a patient-doctor relationship with Dr. Trout on August 17, 1981. Dr. Trout advised Mr. Werner that he discontinue taking persantine. On December 1, 1981, Mr. Werner consulted Dr. Trout about chest pain. Dr. Trout put Mr. Werner on 200 mg. per day of persantine. Dr. Trout was of the opinion that Mr. Werner had suffered or was suffering from mild to moderate severe heart failure. December 1, 1981, was Mr. Werner's last visit to or treatment by Dr. Trout. The complaint was filed two years and four months after Mr. Werner had last been treated by Dr. Trout.

Construing these facts in favor of the nonmoving party on motion for summary judgment, it is my view that the plaintiffs have not filed suit within the statute of limitations period set forth in I.C. § 5–219(4), and I would affirm the trial court.